## A. B. FALKINBURG AND R. B. THOMAS *v.* GEORGE B. LUCY AND CHARLES HYMES.

ISSUING INJUNCTION.—The plaintiff in an action is entitled to an injunction at the time of issuing the summons upon the complaint alone, if it makes a proper case and is verified in the manner stated in the one hundred and thirteenth section of the Practice Act; but if he ask for an injunction thereafter, he must do so upon affidavits.

DISSOLVING INJUNCTION.—Where an injunction has been granted without notice to the defendant, he may move to dissolve, first, upon the papers, whatever they may have been, upon which it was granted; or, second, upon the papers upon which it was granted, and affidavits on the part of the defendant, with or without the answer.

IDEM.—If the defendant rests his motion on the papers upon which the injunction was granted, the plaintiff can make no further showing, but must stand upon his complaint, or his complaint and affidavits, as the case may be; but if the defendant makes a counter showing, by affidavits, with or without the answer, the plaintiff may meet it with a further showing on his part.

IDEM.—If the defendant, moving to dissolve an injunction, uses his verified answer for that purpose, he makes it an affidavit in the sense of the one hundred and eighteenth section of the Practice Act for all the purposes of his motion; and, as in the case of his use of affidavits for that purpose without the answer, the plaintiff is equally entitled to reply by way of affidavits on his part.

TRADE MARKS AT COMMON LAW.—By the common law the manufacturer of goods, or the vendor of goods for whom they have been manufactured, has a right to designate them by some peculiar name, symbol, figure, letter, form, or device, whereby they may be known in the market as his own and be distinguished from other like

goods manufactured or sold by other persons; and when original with him, the owner of such mark will be protected by the Courts in its exclusive use, but only so far as it serves to indicate the origin and ownership of the goods to which it is attached, to the exclusion of such symbols, figures, and combination of words which may be interblended with it, indicating their name, kind, or quality.

TRADE MARKS, AS REGULATED BY STATUTE.—By the terms "peculiar name, letters, marks, devices, figures, or other trade mark or name," as used in the statute concerning trade marks, (Hittel's Laws, Art. 7,134,) is not meant the established and proper names by which the "articles" to which they are attached and by which they are known in the market, nor something indicating their actual kind, character, or quality, but by them is meant, as the subjects of protection against infringement, something new, not before in use—something of the manufacturer's own invention, or first put to use by him—something peculiar to him, and not common to him and others—something which is intrinsically foreign to the "articles" themselves, and only serves to designate them because it has been fancifully put to that use, in disregard of all natural relations.

IDEM.—The statute does not vest in the manufacturer or vendor, as the case may be, any exclusive property in the "articles" manufactured or sold, nor in their names or the words which most aptly and properly describe them; and even if such were the proper construction of the statute, it would be void for want of power in the Legislature to enact it.

IDEM.—If the statute goes beyond the common law, and embraces within its protection matter which relates to kind, character, or quality of "articles," it is not perceived why it does not trench upon the law of copy and patent rights, and is therefore void.

IDEM.—It is suggested, but not decided, that the terms used in the statute, to wit: "to designate it as an article of peculiar kind, character, or quality," were inadvertently incorporated in it under a mistaken notion of the functions of a trade mark, and that in respect of those terms the statute can have no intelligible operation.

TRADE MARK—INFRINGEMENT OF.—In an action to recover damages for an alleged invasion, by imitation, of the plaintiff's trade mark for the sale of a certain washing powder, which consisted of a highly colored picture representing a washroom, with tubs, baskets, clothes lines, etc., also the following legend interblended with it : "Standard Soap Company, Erasive Washing Powder," followed by directions for the use of the "washing powder," and the place of manufacture, the alleged imitation by defendants consisted of a picture and label which were the same as in plaintiff's alleged trade mark only in the use of the words "washing powder," the directions for the use of the powders, and in use of paper of the same color as that used by plaintiff: *Held*, that this did not constitute an infringement of plaintiff's trade mark.

APPEAL from the District Court, Twelfth Judicial District, City and County of San Francisco.

The facts are stated in the opinion of the Court.

*Campbell, Fox & Campbell*, for Appellants.

"Washing powder" is a name denoting quality, and can no more be a trade mark than superfine flour or sewed boots. ( *Williams* v. *Johnson*, 2 Bosw. 1; *Stakes* v. *Landgraff*, 17 Barb. 608; *Amoskeag M. Co.* v. *Spear*, 2 Sandf. 599.) Washing powder designates name and quality, without this aid of user. (2 Douglas, 393; 3 Veas. & Beav. 210; 3 Mylne & Craig, 338; .8 Simmonds, 479; 13 How. Pr. 342, 385; 18 How. Pr. 64.) Defendants must be trying to sell their goods as those of plaintiffs', or no redress. Here defendants sell as made by themselves. ( *Connor* v. *Daly*, 7 Bosw. 222; see, also, Upton's Trade Marks, 110–118, 200; 18 How. Pr. 421; 28 How. Pr. 206.) The trade mark statute of California has made no change in the law governing this case. ( *Derringer* v. *Plate*, 29 Cal. 292.) All the equities of the complaint are denied by the answer, and the injunction should be dissolved. (9 Cal. 553; 13 Cal. 156; 15 Cal. 263; 22 Cal. 479; 23 Cal. 82.)

The affidavits on the part of plaintiffs to contradict the answer were inadmissible. In New York affidavits only are the grounds for granting or dissolving injunctions. (Hoffman's Pro. Rem. 350.) Though pleadings are used, they are treated as affidavits. Practice Act, sections one hundred and thirteen to one hundred and eighteen, allows injunctions to be granted on complaint, and dissolved on answer; treating them, as we claim, as pleadings, and not as affidavits, and draws the distinction between pleadings and affidavits.

*T. B. Reardon,* for Respondents.

If the statute on trade marks is, as the counsel for appellants asserts, on the strength of a single phrase in *Derringer* v. *Plate*, 29 Cal. 292, merely declaratory of the common law, then the defendants have been guilty of an indisputable infringement on plaintiffs' trade mark. The statute (Sec. 5) says:

"Every alteration or imitation of any trade mark or name which has been filed in accordance with section two of this

Act, which shall be made, applied, or used, or which shall cause any trade mark or name with such alteration or imitation to resemble any genuine trade mark or name, so as to be calculated or likely to deceive, shall be deemed to be a counterfeit trade mark or name within the meaning of this Act."

The resemblance need not be such as would not be detected by persons of ordinary intelligence. The character and condition of those usually purchasers of the merchandise has much to do with the consideration of the question of deception. (Upton on Trade Marks, 214, 216, 227; Rolle Rep. 28.)

The substitution of defendants' name and place of business is merely a colorable change from the original trade mark. Name and place of business are unimportant, and merely colorable variations of the original label. (*Clark* v. *Clark*, 25 Barb. 76; *Walton* v. *Crowley*, 3 Blatchf. C. C. 440.)

The proposition advanced by defendants' counsel, that any one adopting a trade mark has no right "to either words or symbols, which, having no relation to origin or ownership, only designate the name or quality," is directly met by the statute, (Sec. 1,) which says: "When any person who has complied with the provisions of section two of this Act, uses any peculiar name, letters, marks, device, figures, or other trade mark or name, cut, stamped, cast, or engraved upon, or in any manner attached to or connected with any article or the covering or wrapping thereof, manufactured or sold by him, to designate it as an article of a peculiar kind, character, or quality, or as an article manufactured or sold by him," etc.

Had the Legislature intended trade mark protection only to that portion of a label which indicated origin or ownership, the words "to designate it as an article of a peculiar kind, character, or quality," would hardly have been used, implying that designations of quality, as well as of ownership, were proper subjects for trade mark appropriation.

The doctrine that a name must indicate origin and ownership to be a subject for the protection of equity, is a leading point in the defense. In broaching this point of the law, I

feel that I am approaching the border ground of conflicting decisions. In some, such a narrow principle is totally disregarded, (*Coffeen* v. *Brunton*, 4 McLean, 519, and *Davis* v. *Kendall*, 2 Rhode Island, 566;) in others, it is maintained with an arbitrary tenacity that would lead one to suspect that it was the exponent of some plain suggestion of reason. I respectfully submit that in the present case it is of no consequence what may be the correct ruling.

Leaving out of view the explicit wording of the statute which puts any peculiar name or any indication of the quality of the article within the province of trade mark rights, the whole spirit of the decision is, that anything in the label indicating a desire on the part of the imitator to lead the public into the belief that the article manufactured by him is that of another, is an infringement of the rights of the prior manufacturer.

A name may indicate origin and ownership and yet not be a trade mark. (*Thomson* v. *Winchester*, 19 Pick. 214.) A manufacturer may use his own name in such a way as to be guilty of fraud upon a rival. (*Sykes* v. *Sykes*, 3 B. and C. 541; see, also, the case of *Rodgers* v. *Nowill*, 5 Man. Gr. and Scott, 109.)

It appears that at common law when the question whether an imitation name is an infringement or not is the subject of discussion, origin and ownership may or may not be elements therein. They form no *experimentum crucis* by which to analyze the issue. The real question is, whether the imitation would lead an unwary purchaser to purchase a compound so introduced instead of the original.

The Courts will not point out exactly what portions of a trade mark can be imitated with impunity. (*Williams* v. *Johnson*, 2 Bos. Sup. Court, 7–9.) The injunction should coincide in extent with the deception worked. (*Clark* v. *Clark*, 25 Barb. 76, 80; *Coats* v. *Holbrook*, 2 Sandf. Ch. 594; *Williams* v. *Johnson*, 2 Bos. Sup. Court, 7–9; 4 Abb. Pr. 156; *Comstock* v. *Moore*, 18 How. Pr. 42; *Coffeen* v. *Brunton*, 4 McLean, 516, 519.)

From the foregoing settled points of the common law of trade marks, and from the plain and distinct wording of the statute, I deduce the following:

1. That the plaintiffs' trade mark, consisting as it does of a name—"Standard Soap Company's Concentrated Erasive Washing Powder"—of a pictured device, of a peculiar arrangement of type, of "directions," etc., is entitled to protection in every particular, as filed in the office of the Secretary of State.

*a.* The name "Standard Soap Company" indicates origin and ownership, and puts the entire compound under the rule.

*b.* Were there no name indicating origin and ownership, but merely the portion "Concentrated Erasive Washing Powder," or "Washing Powder" alone, still the statute clearly gives a trade mark right to the proprietor to any name which he chooses to adopt, indicating the quality or the character of the compound manufactured.

*c.* The acts of the defendants in taking wrappers of the same color, type of a similar size and appearance, in using the "directions," and giving to their labels a general similarity, apart from the colorable variation—Excelsior Washing Powder—of the plaintiffs' designation—Concentrated Erasive Washing Powder—are fraudulent, making it probable as well as possible that the consumers of the article may mistake the defendants' compound for that of the plaintiffs.

2. The defendants have infringed, by their label, upon every portion of the plaintiffs' trade mark.

*a.* They have shown an intention to palm off upon the public their article as and for that of the plaintiffs, by adopting the same name with plaintiffs—"Washing Powder," by making use of colorable variations on that name, using adjectives liable to be confounded by the consumers with those employed by the plaintiffs, and by taking the whole of plaintiffs' label as an entirety for the compound.

8

By the Court, SANDERSON, J.:

This is an action to recover damages for an alleged invasion of the plaintiffs' right of property in a certain trademark, and to restrain the defendants by injunction from further use or imitation. Upon the filing of the complaint an injunction was issued and served, and thereupon the defendants filed their answer and moved to dissolve the injunction upon the complaint and the answer, with the exhibits thereto respectively attached.

At the hearing the plaintiffs offered to read an affidavit made by one of them in contradiction of certain matters contained in the answer. To this the defendants objected upon the ground that the plaintiffs could not use affidavits in opposition to the motion unless the defendants first used them in support of the motion, which, as was claimed, had not been done. This objection was overruled, the affidavit heard, and the motion to dissolve finally denied. The appeal is from the order refusing to dissolve the injunction. The grounds of alleged error are two:

First—Admitting and considering the plaintiffs' affidavit as above stated.

Second—Refusing to dissolve the injunction.

1. In view of the conclusion which we have reached upon the second point we might pass the first without special notice; but it is asserted on the part of counsel that upon the first point no uniform rule prevails in the lower Courts, and a construction of the statute by this Court is asked, to the end that a uniform practice may be established.

By the one hundred and thirteenth section of the Practice Act it is provided that an injunction may be granted, at the time of issuing the summons, upon the complaint; and at any time afterwards, before judgment, upon affidavits.

By the one hundred and eighteenth section it is provided that where an injunction has been granted without notice, the defendant may move to dissolve upon the complaint and affidavits upon which the injunction was issued, or upon the

affidavit of the defendant, with or without the answer; and, if upon affidavits, the plaintiff may oppose the same by affidavits or other evidence, but not otherwise.

In the code of New York this subject is regulated by the one hundred and twentieth section, which fills the place occupied by the one hundred and thirteenth section of our Practice Act, and the one hundred and twenty-fifth and one hundred and twenty-sixth sections, which together cover the ground embraced by the one hundred and eighteenth section of our statute. The one hundred and twenty-fifth and one hundred and twenty-sixth sections of the New York code are in all respects the same as the one hundred and eighteenth section of our Practice Act; but the one hundred and twentieth section of the former differs from the one hundred and thirteenth section of the latter; the latter allows an injunction to be granted upon the complaint, as such, while the former does not, but requires an affidavit where the injunction is issued at the time of commencing the action, as well as where issued afterward. With this exception there is no difference between the two statutes.

Upon the question whether the plaintiff may use affidavits or other evidence in addition to those upon which the injunction has been granted in opposition to a motion to dissolve or modify, where the defendant rests his motion upon a verified answer, unaccompanied by any affidavits or other evidence on his part, there has been much conflict of opinion in the lower Courts of New York. So far as we are advised, the question has never been settled by the Court of Appeals. The negative is supported by the following cases: *Merrimac Manufacturing Company* v. *Garner*, 2 Abb. 318; 4 E. D. Smith, 387; *Blatchford* v. *New York and New Haven Rail Road Company*, 7 Abb. 322; *Servoss* v. *Stannard*, 2 Code R. 56; *Hartwell* v. *Kingsley*, 2 Code R. 101; 2 Sandf. 674; *Benson* v. *Fash*, 1 Code R. 50; *Roome* v. *Webb*, 1 Code R. 114; 3 How. 327; *Milliken* v. *Carey*, 3 Code R. 250; 5 How. 272. And the affirmative by the following: *Krom* v. *Hogan*, 2 Code R. 144; 4 How. 225; *Schoonmaker* v. *Reformed Dutch*

*Church,* 5 How. 267; *Hascall* v. *Madison University,* 1 Code R., N. S., 170; *Jaques* v. *Areson,* 4 Abb. 282; *Hollins* v. *Mallard,* 10 How. 540; *Fowler* v. *Burns,* 7 Bosw. 637.

In the case last cited the question was maturely considered, and the conclusion reached that if the defendant moves upon a verified answer the plaintiff may oppose the motion with new and additional affidavits. This diversity of opinion was due, doubtless, as suggested in *Fowler* v. *Burns,* to the mistaken notion on the part of some members of the bench and bar, that it was not intended by the code to change the practice, in this respect, which had previously existed in that State. It was settled prior to the code, under the chancery practice of that State, that where the defendant moved upon bill and answer only, the plaintiff could not read affidavits. (1 Johns. Ch. 211; 2 Johns. Ch. 202; 4 Johns. Ch. 26; 1 Paige, 164; 4 Paige, 111.) Familiarity with that practice, doubtless, led to its continuance in many cases under the code.

We consider the rule stated in *Fowler* v. *Burns, supra,* to be a correct exposition of the statute. The law of the question we hold to be as follows: The plaintiff is entitled to an injunction at the time of issuing the summons upon the complaint alone if it makes a proper case and is verified in the manner stated in the one hundred and thirteenth section; but if he asks for an injunction at any time thereafter he must do so upon affidavits. If the injunction has been granted without notice to the defendant, he may move to dissolve, first, upon the complaint and affidavits, or, in other words, the papers, whatever they may have been, upon which the injunction was granted; or, second, upon the papers upon which it was granted, and affidavits on the part of defendant, with or without the answer. If the defendant rests his motion upon the papers upon which the injunction was granted, the plaintiff can make no further showing, but must stand upon his complaint, or his complaint and affidavits, as the case may be. If, however, the defendant makes a counter showing by affidavit, with or without the answers,

the plaintiff may meet it with a further showing on his part. It will be observed that the defendant is not allowed to move upon the answer with or without affidavits, but upon affidavits with or without the answer; hence, if he moves upon what he has prepared as his verified answer, he makes it an affidavit in the sense of the statute for all the purposes of his motion, and he cannot deprive the plaintiff of his right to reply, by calling it an answer instead of an affidavit.

Under the old chancery practice, as already suggested, the defendant could move upon bill and answer, and if he did so, the plaintiff could make no further showing. This rule made it necessary for the plaintiff to anticipate the defendant's case and annex to his bill affidavits, more or less numerous, according to circumstances, designed to meet it. This was imposing upon the plaintiff labor which might prove useless. It was also contrary to the more orderly and logical mode of getting at the case. We, therefore, consider that it was the intention of the framers of the New York code to relieve the plaintiff from the necessity of anticipating the defendant's case, and to adopt the more orderly and logical practice of requiring the plaintiff, in the first instance, to make a *prima facie* case only, and giving him an opportunity to meet the defendant's case after it has been presented.

2. The plaintiffs' label commences with a highly colored picture, representing a washing-room, with tubs, baskets, clothes lines, etc. There are two tubs painted yellow, at each of which stands a female of remarkably muscular development, with arms uncovered, and clad in a red dress, which is tucked up at the sides, exposing to view a red petticoat with three black stripes running around it near the lower extremity. Each is apparently actively engaged in washing, and clouds of steam are gracefully rolling up from the tubs and dispersing along the ceiling. In the background is extended across the room a clothes line, upon which are suspended stockings, and other undergarments, which have evidently just been put to use in testing the cleansing properties of the plaintiffs' washing powder. To the left of the

washerwomen stands a lady in a yellow bonnet, red dress, green Congress gaiters, and hoops of ample circumference; upon her left arm is suspended a yellow basket; and in her left hand, which is encased in a red glove, is held a red parasol; while the right hand, which is encased in a green glove, is gracefully extended towards the nearest washerwoman in an attitude of earnest entreaty. In the immediate foreground is a yellow and green clothes basket, full of dirty linen, and a yellow and green soap packing box, upon which are printed in small capitals, the words: "Standard Co.'s Soap." Each washtub is supported by a four-legged stool—some of the legs being yellow, some red, some green, and some all three. The floor of the room, as to color, is in part of a yellowish green, and in part of a greenish red, while the walls are of a grayish blue. This is but an imperfect description of the picture with which the plaintiffs' label is adorned. The design is good, for it is eminently suggestive of the character of the plaintiffs' goods.

Over the top of this picture are printed, in large capitals, the words "Standard Soap Company;" at the right the word "Concentrated;" at the left "Erasive," and at the bottom, in still larger type, the words "Washing Powder"—completing the following legend: "Standard Soap Company Concentrated Erasive Washing Powder."

Next follows laudatory remarks and directions for use; also, directions for making soft soap by dissolving the washing powder in water; also, a statement as to the different packages in which the powder is put up, concluding with a designation of the place where the powder is manufactured, in the following form and words:

MANUFACTURED AT
No. 207 COMMERCIAL STREET,
Bet. Front and Davis—Concrete Building,
SAN FRANCISCO.

The label is upon buff paper, and all the printed matter is in black ink.

The defendants. have two labels, one of which commences with the figure of a parallelogram, made by two red lines, the inner one light and the outer one heavy. Inside are printed the following words, in large type:

"Lucy & Hymes' Excelsior Washing Powder," followed by the words "Lucy & Hymes," in script, with the words "none genuine without our signature," added in type—all in blue ink except the words "washing powder," which are in red ink. Next follows a copy of the plaintiffs' label down to the place where the place of manufacture is given, which is as follows:

MANUFACTURED BY

LUCY & HYMES;

Factory—Beale Street, between Mission and Howard, San Francisco.

OFFICE—No. 319 CALIFORNIA STREET.

All below the parallelogram is printed in blue ink, whereas the plaintiffs' label, as already stated, is printed in black ink. At the foot of the plaintiffs' label are the words "trade mark secured," whereas no such words are upon the defendants' label.

The other label of the defendants is substantially the same, except that instead of the matter in type and script, the parallelogram incloses a picture representing an enthusiastic young man, with head uncovered, and hair blown out behind by what one, judging of causes by their effects, might suppose to be a strong breeze. He is dressed in a blouse, tights, and top-boots; in his right hand he bears a banner, upon whose folds, as they flutter in the breeze, appears, in large type, the word "Excelsior." His left arm is extended upward and pointing toward the summit of a high and precipitous mountain, which towers in front of him, and which, as his bearing indicates, he proposes to climb. The principal colors used in this cut are blue and white. On the right of the picture is printed "Lucy & Hymes';" on the left

"Excelsior," and underneath "Washing Powder"—making the legend "Lucy & Hymes' Excelsior Washing Powder," all in red ink. The signature of the defendants in script, and the words, "None genuine without our signature," inclosed in the parallelogram in the other label, appear in this at the foot of the directions for the use of the compound.

From the foregoing it will be seen that the labels are the same in three respects only—the words "Washing Powder," the directions as to use, and mode of making soft soap, and the color of the paper upon which they are printed. In all other respects they are unlike.

By the common law the manufacturer of goods, or the vendor of goods for whom they have been manufactured, has a right to designate them by some peculiar name, symbol, figure, letter, form, or device whereby they may be known in the market as his, and be distinguished from other like goods manufactured or sold by other persons. The owner of such peculiar marks, provided they are original with him, will be protected in their exclusive use by the Courts; but only so far as such marks serve to designate the true origin or ownership of the goods to which they are attached. He will not be protected in the use of figures or symbols, or combinations of words which serve merely to indicate the name, kind, or quality of the goods to which they are attached, notwithstanding they may be interblended with others which indicate origin and ownership. *(Fetridge v. Wells*, 4 Abb. Pr. 144; *The Amoskeag Mfg. Co.* v. *Spear*, 2 Sandf. S. C. 599; *Stokes* v. *Landgraff*, 17 Barb. 608.) This rule obviously follows from the admitted policy upon which the law in relation to trade marks is founded, which is two-fold—to protect purchasers from the fraud and imposition of persons who may seek, by false representations, to dispose of inferior goods of their own manufacture as those of a superior quality and established reputation manufactured or sold by other parties, and to secure to every manufacturer the merited fruits of his own industry and inventive skill, without, however, creating a monopoly or interfering with

the right of every one to manufacture or sell the same kind of goods.

The plaintiffs claim their entire label as their trade mark, and ask to be protected in the use of it as a whole; but it is clear that the common law gives no countenance to such a claim. Only so much of their label as serves to indicate that they are the manufacturers or vendors of the washing powder can be considered as constituting the legitimate characteristics of a common law trade mark. Hence, for the purpose of determining whether the conduct of the defendants has been actionable at common law, all that portion of the plaintiffs' label which relates to the name of the compound in question, its mode of use, laudation, and soft soap, must be discarded, as constituting, in a common law sense, no part of a trade mark. Indeed, it may be doubted whether the picture can be considered as matter of trade mark. In *Partridge* v. *Menck*, 2 Sandf. Ch. 622, both labels were embellished with a woodcut of a beehive, yet the preliminary injunction was dissolved. The injunction was also dissolved in the case of the *Merrimack Mfg. Co.* v. *Garner*, notwithstanding the words used were inclosed in a floral wreath in both labels. (4 E. D. Smith, C. P. R. 391.) We shall, however, treat the picture of the washroom and its occupants as a part of the plaintiffs' trade mark.

It follows that the only parts of the plaintiffs' label which can, by the common law, be considered as constituting their trade mark are the picture of the washroom, with its implements and occupants, the legend by which it is surrounded, with the exception of the words "Washing Powder," and the words designating the place of manufacture.

Applying the same erasing process to the defendants' label and we have left only the words "Lucy & Hymes' Excelsior Washing Powder" in type, followed by a repetition of their names in script, and terminating with the words "None genuine without our signature;" all inclosed in a parallelogram made by two red lines, and the words designating the factory

and address of defendants in the one, and the same in the other, with the picture already noted added.

Now compare the two, and it is manifest that the charge of piracy or colorable imitation, tested by the common law, is without the slightest foundation. The plaintiffs have a highly colored and suggestive pictorial embellishment; the defendants have none in one, and a very different one in the other label. The plaintiffs call their compound "The Standard Soap Company's Concentrated Erasive Washing Powder;" the defendants call theirs "Lucy & Hymes' Excelsior Washing Powder."

The plaintiffs state that their compound is

MANUFACTURED AT
## NO. 207 COMMERCIAL STREET,
Bet. Front and Davis—Concrete Building,

SAN FRANCISCO.

The defendants, that theirs is

MANUFACTURED BY
## LUCY & HYMES,
Factory—Beale Street, between Mission and Howard, San Francisco.

OFFICE—NO. 319 CALIFORNIA STREET.

There is not a mark, device, symbol, or word, denoting origin or ownership, common to both. No one could mistake the modest parallelogram of the defendants for the highly colored pictorial wash-house of the plaintiffs. No one could mistake the defendants' young man in a blouse and tights, climbing a mountain with a banner in his hand, for the plaintiffs' washerwomen in red petticoats, with their arms in a washtub and their heads enveloped in clouds of steam. No one could mistake the defendants' legend—"Lucy & Hymes' Excelsior Washing Powder"—for the plaintiffs' "Standard Soap Company's Concentrated Erasive

Washing Powder," or at least only such persons as no amount of legislative care could protect from blunders and mistakes. The only matter common to both is the name of the article— "Washing Powder"—in which, as already stated, the plaintiffs can acquire no exclusive property, because it is the name by which compounds of like kind are known in the market, and which every person has an equal right to use. No right of the plaintiffs which has its foundation in the common law has, therefore, in our judgment, been violated or intruded upon by the defendants.

The plaintiffs, however, ground their cause of action, in part, if not mainly, upon the statute of this State in relation to trade marks, of which they have secured the benefit; and claim, that by virtue of the statute, they have rightfully incorporated in their trade mark, as a part of it, matter which denotes the peculiar kind, character and quality of the compound to which it is attached, and may, therefore, claim for it the same measure of protection which the common law accords to matter which denotes origin and ownership. The first section of the statute reads as follows:

"When a person * * * uses any peculiar name, letters, marks, devices, figures, or other trade mark or name, cut, stamped, cast or engraved upon, or in any manner attached to, or connected with any article, or with the covering or wrapping thereof, manufactured or sold by him, *to designate it as an article of a peculiar kind, character or quality*, or as an article manufactured or sold by him, * * * it shall be unlawful for any other person, without his consent, to use said trade mark or name, or any similar trade mark or name, for the purpose of representing any article to have been manufactured or sold by the person rightfully using such trade mark or name, or to be of the *same kind, character or quality* as that manufactured or sold by the person rightfully using such trade mark or name."

The second section prescribes how the benefits of the

statute may be secured. Subsequent sections prescribe remedies and penalties for a violation of the statute, among which are damages and injunctions.

It is claimed, on the part of the plaintiffs, that the matter already noted as common to the labels of both parties, indicates the "kind, character and quality" of their compound in the sense of the statute, and is, therefore, protected by it.

This common matter reads as follows:

## "SAVES LABOR AND TIME.

" DIRECTIONS FOR WASHING:—For washing of forty or fifty pieces:

" 1st. Take two pails of water, and put therein one fourth of this package, or a quarter of a pound of powder.

" 2d. Bring the water to a boiling heat.

" 3d. Pour this boiling water or solution on the clothes and let them soak for half an hour or more, and while they are soaking stir them briskly with a staff or dasher three or four different times.

" 4th. Wring them out, rubbing the soiled spots slightly.

" 5th. Put them in the boiler, adding two or three teaspoonsful of the powder.

" After boiling three minutes, remove them, rinse them well in two waters, blueing the second water.

" This powder, used according to the above directions, saves one half the labor, and the clothes will come out beautifully clean and white.

" Warranted not to rot or injure the clothes.

" This washing powder also contains all the requisite properties to make a fine soft soap.

" Give it a trial and judge for yourself."

" DIRECTIONS FOR MAKING SOFT SOAP.—Dissolve the contents of a one pound package in four quarts of boiling water. When thoroughly dissolved, add sufficient water to make two gallons; or, should you desire to make the soap thinner, add water at pleasure.

"Put up in one pound packages, twelve and twenty-four in a box; and in ten pound boxes, in bulk.

"No person will be without this valuable compound after once having given it a trial.

"Adapted for hard and salt water. Superior for washing fine goods.

"Woolens without shrinking.

"No soap is required with these powders."

Then follows the place of manufacture, after which comes the following:

"These powders may be used in the place of soap, wherever soap is required, and will be found more convenient and economical for washing woodwork, dish-washing, etc. A little experience in using it will enable a person to judge of the quantity required."

Does the foregoing, or any part thereof, constitute the "peculiar name," "peculiar letters," "peculiar marks," "peculiar device," or "peculiar figures," mentioned in the statute? What does the statute mean by a "peculiar name, letter, mark, device and figure?" We do not understand it to mean the proper and established name by which the compound or goods are known in the market. It must be something new, not before in use—something of the manufacturer's own invention, or first put to use by him—something peculiar to him, and not common to him and others—not something indicating the actual kind, character, or quality of the compound; as, for instance, the ingredients of which, and the proportions in which, it is compounded, or the various uses to which it may be put, or the effects produced by it, but something extrinsic, not indicative—something intrinsically foreign to the compound itself, and which serves to designate it only because it has been fancifully put to that use, in disregard of all natural relations; as, for example: "Merrimack Prints," "Clubhouse Gin," "Old London Gin," "Genuine Yankee Soap." Here the names do

not denote the intrinsic qualities of the article; they are fanciful names, by which in time the article may become known, and its "kind, character and quality" be designated in the sense of the statute. Without any intrinsic relation to prints, the word "Merrimack" is made, by adoption and use, to designate prints of a certain kind, character and quality, in the sense of the statute. So of "Clubhouse," "Old London," and "Genuine Yankee."

That the statute was not intended to protect parties in the use of proper and established names, or words, or combinations of words, intrinsically indicative of kind, character, and quality, must be conceded when it is considered that everything must of necessity have a name and be possessed of certain qualities which certain words most aptly and properly describe; and that no person can have an exclusive property in such name or words who has not also an exclusive property in the thing itself to which they are applied. The statute vests in the manufacturer or vendor, as the case may be, no exclusive property in the thing manufactured or sold; and if it did, it would be so far void, for the want of power in the Legislature. The plaintiffs having no patent for the manufacture and sale of the compound in question, the defendants have an equal right to manufacture and sell it, and by parity of reason, and of necessity, an equal right to use its proper name and designate its qualities by any apt and proper words, notwithstanding the plaintiffs may be using the same. Such name and such words are not "peculiar," in the sense of the statute; on the contrary, they are the common property of all persons having occasion to use them.

If, as claimed by the plaintiffs, the statute means that a manufacturer or vendor of goods may describe their intrinsic qualities in words in common use, and, upon filing his label in the office of the Secretary of State, secure an exclusive right to such or any similar description, the privilege attempted to be conferred by it is equivalent to a perpetual copyright, and the monopoly created is more durable than a

patent right—neither of which has the Legislature the power to grant.

Under such a reading, the miller who manufactures different qualities of flour may describe them in his label as "middling," "fine" and "superfine," and thus prevent all other millers from using those words for a like purpose. The compounder of pills may apply to them the term "antibilious," and thereafter no other compounder of pills can use it. If, as claimed by the plaintiffs, mere directions for use indicate quality, and may, therefore, be the subject, under the statute, of exclusive property, no one but the plaintiffs can manufacture and sell the powder in question, because no one else can be allowed to give the same or similar instructions for its use; yet they have no patent. The vendor of medicines, who first files his label in the office of the Secretary of State, with the usual instructions: "To be taken before eating;" "To be taken before going to bed;" "To be well shaken before taken," and so on to the end of the catalogue, may acquire an exclusive right to all the usual instructions which must necessarily accompany medicines, and thereby monopolize the trade.

What may be the precise meaning of the statute, it is not easy to say. If it goes beyond the common law, and embraces within its protection matter which relates to kind, character and quality, we are unable to perceive why it does not trench upon the law of copy and patent rights, and is not, therefore void. It certainly does, if for that purpose it goes beyond fanciful and extrinsic terms, as above stated. Whether such terms, even, so far as they indicate kind, character, or quality only, can be protected, is most doubtful.

We are inclined to think that the matter in relation to kind and quality was inadvertently incorporated in the statute, under a mistaken notion of the functions of a trade mark, and that, in that respect, the statute can have no intelligible operation; but it is unnecessary, for the purposes of the present case, to finally determine its meaning; for, as we have already seen, there are no "peculiar names, marks,

etc.," denoting kind, character or quality, in the plaintiffs' label, in the sense of the statute, whatever that sense may be, which the defendants have copied or imitated. The nearest approach to terms denoting kind and quality are the words "concentrated" and "erasive," neither of which is used by the defendants.

The injunction should have been dissolved, and the Court below is directed to enter an order to that effect.

Mr. Chief Justice SAWYER delivered the following dissenting opinion, in which Mr. Justice SPRAGUE concurred:

This is an action to enjoin the use of plaintiffs' trade mark, adopted in pursuance of the Act of April 3d, 1863. The averments of the complaint as to what constitutes the plaintiffs' trade mark are somewhat loose. Their compound was named "Concentrated Erasive Washing Powder," and it is alleged to have been sold "in packages of one third, one, and ten pounds, each labeled with their own proper device and trade mark, adopted by said Cogswell & Thomas for that purpose on the 22d day of February, 1865, aforesaid, and filed in accordance with the statute in such cases made and provided, in the office of the Secretary of State, of which label a copy is hereunto attached, and marked 'Exhibit A.'" Said exhibit is the entire label, and the whole is claimed in argument to be the trade mark, and I think, upon the whole, it is substantially so averred.

It is not pretended that the plaintiffs have any exclusive right, by patent or otherwise, to make or vend the compound itself. If they have any right of action, it is, in the language of the statute, for the use of their "trade mark or name for the purpose of representing" defendants' compound "to have been manufactured or sold * * * or to be of the same kind, character, or quality as that manufactured and sold" by the plaintiffs.

The plaintiffs' label annexed to the complaint is headed

by a very highly colored, conspicuous, and striking cut, in the form of a parallelogram, surrounded by the name of the compound in black capital letters, thus:

STANDARD  SOAP  COMP'Y

CONCENTRATED          (CUT.)          ERASIVE

WASHING  POWDER.

The cut represents two women dressed in red garments, each engaged in washing at a yellow washtub resting upon a bench; while a third woman, dressed in similar colors, apparently a customer, is in the act of addressing the washers. In the background is a clothesline, with various articles of clothing hung upon it to dry, and in the foreground a basket of clothes, and a box labeled "Standard Soap Co. Soap." Towards the bottom of the label, in the form following, are the words:

MANUFACTURED AT

204  SACRAMENTO  STREET,

SAN FRANCISCO.

The rest of the label contains full directions for using, and an indication and commendation of its qualities; the whole label, except the cut, printed in black ink.

The defendants' label, also annexed to the complaint, has no cut whatever. It is printed upon paper of the same color as that of plaintiffs', headed with a square, formed by a light red line within a heavy red line, inclosing the name of defendants' compound, etc., thus:

LUCY & HYMES'

EXCELSIOR

WASHING  POWDER.

LUCY & HYMES.  (*In script.*)

☞ None genuine without our signature. ☜

The words "Washing Powder," being in red, and all the rest of the label in blue ink—the signature being in script.

Near the bottom of the label, at a point corresponding with a similar notice in plaintiffs' label, in the following form, are the words:

MANUFACTURED BY

LUCY & HYMES,

Factory—Beale Street, between Mission and Howard, San Francisco.

OFFICE—No. 319 CALIFORNIA STREET.

The directions for using, indications of qualities, commendations, etc., are in small type, and with the exception of the color of the ink, which is blue, are exact copies of those in plaintiffs' label.

The defendants have another label, which presents no greater similarity to plaintiffs' label than the one described.

Have the defendants been guilty of using the plaintiffs' name or trade mark, or of a similar name or trade mark?

It is manifest from inspection that the two names and headings—the most conspicuous parts of the labels—are not the same. "Standard Soap Company's Concentrated Erasive Washing Powder" is, certainly, a different name from "Lucy & Hymes' Excelsior Washing Powder." Washing Powder is the only portion in common, or in the slightest degree similar, and this is not a distinctive appellation.

It is as descriptive of one as the other, and may be equally descriptive of any one of numerous other compounds that

are, or may be, made. In the language of the statute, there is nothing "peculiar" about them, or in their combination, or use. Any soap suitable for washing in the form of a powder, may be very properly called washing powder. These two words belong to the English language, and are in very common use, and words of that character are not the subject of exclusive property. Suppose the word, "soap," had been used in the place of washing powder, I apprehend it would not be pretended that the plaintiffs could acquire an exclusive property in the word, "soap," so that no other party could adopt it as a part of the name, or description of any compound he might manufacture and sell for the ordinary purposes to which the numerous varieties of soap are applied. So the words, "washing powder," are no more descriptive or indicative of the plaintiffs' soap, than of any other of a great variety of powders, that are, or may be, compounded suitable for washing. They simply indicate a compound, in the form of a powder, used for washing, possessing many attributes common to many other compounds. They point to no particular person as the maker, and do not express the origin, ownership, or place of manufacture, or sale. It is a sort of generic, and not a "peculiar" term.

The law applicable to trade marks has been much discussed within the last few years, and in no cases, perhaps, more thoroughly than in *Amoskeag Manufacturing Co.* v. *Spear*, 2 Sandf. 599; *Corwin* v. *Daly*, 7 Bosw. 222; *Coats* v. *Holbrook*, 2 Sandf. Ch. 587; *Taylor* v. *Carpenter*, 2 Sandf. Ch. 603; *Newman* v. *Alvord*, 49 Barb. 590; see, also, *Partridge* v. *Menck*, 2 Sandf. Ch. 625; *Williams* v. *Johnson*, 2 Bosw. 1; *Stokes* v. *Landgraff*, 17 Barb. 608; *Fetridge* v. *Wells*, 4 Abb. 144; *Clark* v. *Clark*, 25 Barb. 77; *Brooklyn White Lead Company* v. *Masury*, 25 Barb. 417; *Wolfe* v. *Goulard*, 18 How. Pr. 64; *Coffeen* v. *Brunton*, 4 McLean, 516; *Burnett* v. *Phalon*, 9 Bosw. 192; *Howe* v. *Howe Machine Co.*, 50 Barb. 241, and cases referred to in those cited. From these authorities it would appear, that the rule at common law is against appropriating mere words as a trade mark, unless they indi-

cate ownership or origin, having no reference to quality or use. But some modern authorities do not seem to regard any direct reference to origin or ownership in the signification of the words themselves necessary. (*Sexio* v. *Provizinde*, 1 Law R. Ch. App. 192; *Ainsworth* v. *Wamsley*, 1 Law Rep. Eq. 523; 3 Am. L. Rev. 189.)

The ordinary words of the language, merely *as words* or names, expressing the kind or quality of the articles to which they are applied, and which may be common to different articles, are not the subject of property. (See, particularly, *Corwin* v. *Daly*, 7 Bosw. 233; *Stokes* v. *Landgraff*, 17 Barb. 609; *Wolfe* v. *Goulard*, 18 How. Pr. 69; *Amoskeag Man. Co.* v. *Spear*, 2 Sandf. 600; *Benninger* v. *Wattles*, 28 How. Pr. 206; *Newman* v. *Alvord*, 49 Barb. 591.) This rule, however, appears to have reference to the use of *words*, etc., *merely*, and *not* to their *combination and arrangement*. (*Williams* v. *Johnson*, 2 Bosw. 1.)

I think the plaintiffs could acquire no exclusive right of property in the words "washing powder," and that they are not entitled to have the defendants enjoined from using them as a part of their own name, or trade mark. As to the rest of the name, that part of it, and that, alone, which can with any reason be regarded as distinctive or indicative—"Standard Soap Company's Concentrated Erasive"—is as far removed from similarity to "Lucy & Hymes' Excelsior" as it could well be. One is as peculiar as the other. Each points to particular persons as the makers. Each expresses origin and ownership. One points to the "Standard Soap Company," the other to "Lucy & Hymes." And when we look for an indication of the place of manufacture, we find the former proclaimed in large capitals to be "Manufactured at No. 207 Commercial street, between Front and Davis, concrete building, San Francisco," and the other, in capitals equally conspicuous, "Manufactured by Lucy & Hymes. Factory, Beale street, between Mission and Howard, San Francisco. Office, No. 319 California street." The defendants make it appear as prominent as possible that they are selling a com-

pound of their *own manufacture as their own*, and by their own particular name, giving the place where it is manufactured and where it is to be obtained; and the name of the compound, of the makers and owners, and the place where made, are all different from those pertaining to plaintiff's compound. A party who can read, and who has once become acquainted with plaintiffs' label, could not possibly mistake one for the other. Still less are the illiterate liable to be misled. The modest square formed by simple red lines inclosing the name of defendants' compound, displaying in large capitals, "Lucy & Hymes' Excelsior Washing Powder," could by no possibility be mistaken for the plaintiffs' flaming cut of the washerwomen at their work. And the same may be said of the cut upon defendants' other label. These are the only prominent and striking features in both labels, and the only ones at all likely, as peculiar symbols, to attract the attention, or impress themselves upon the minds of illiterate parties using, or desiring to purchase, the respective compounds. And they are as different as they can well be. As to this part of the label, there is no infringement upon, or imitation of, plaintiffs' trade mark.

But the entire body of defendants' label, except the heading, the names of the makers and place of manufacture, is a verbatim copy, and as to type and mode of setting up, is very nearly a *fac simile* of the plaintiffs' label. It is as follows:

## "SAVES LABOR AND TIME.

"DIRECTIONS FOR WASHING.—For a washing of 40 or 50 pieces:

"1st. Take two pails of water, and put therein one fourth of this package, or one fourth of a pound of the powder.

"2d. Bring the water to a boiling heat.

"3d. Pour this boiling water or solution on to the clothes, and let them soak for half an hour or more, and while they are soaking stir them briskly with a staff or dasher three or four different times.

"4th. Wring them out, rubbing the soiled spots slightly.

"5th. Put them in the boiler, adding two or three table-spoonfuls of the powder.

"After boiling three minutes, remove them, rinse them well in two waters, blueing the second water.

"This soap, used according to the above directions, saves one half the labor, and the clothes will come out beautifully clean and white.

"Warranted not to rot or injure the clothes.

"This washing powder contains all the requisite properties to make a fine soft soap.

"Give it a trial and judge for yourselves."

"DIRECTIONS FOR MAKING SOFT SOAP.—Dissolve the contents of a one pound package in four quarts of boiling water; when thoroughly dissolved, add sufficient water to make two gallons; or should you desire to make the soap thinner, add water at pleasure.

"Put up in one pound packages, 12 and 24 in a box; and in ten pound boxes, in bulk.

"No person will be without this valuable compound after once having given it a trial.

"Adapted for hard and salt water. Superior for washing fine goods and woolens without shrinking.

"No soap is required with these powders.

"These powders may be used in the place of soap wherever soap is required, and will be found more convenient and economical for washing woodwork, dish-washing, etc. A little experience in using it will enable a person to judge of the quantity required."

Strictly speaking, these descriptions and directions are, perhaps, not the technical trade mark. But they are always found upon the labels accompanying certain classes of articles in connection with the trade mark proper, as auxiliary to it; and, in many of the cases cited, they are noticed in the discussion, as forming a part of the devices, and symbols

illustrative of the claims and designs of the parties using them, and treated as being within the protection of the laws. The statute does not limit the parties to any particular number of symbols, devices, letters or words, or any particular combination. The whole label appears, I think, from the allegations of the complaint, to have been filed as the plaintiffs' trade mark. Whatever the rule may have been before, I think this portion of the label within the scope of the protection afforded by the peculiar language of, at least, one provision of the statute. It provides, that "it shall be unlawful for any other person, without his (the owner's) consent, to use said trade mark or name for the purpose of representing any article * * * to be of the same kind, character or quality as that manufactured or sold by the person rightfully using said trade mark or name." This provision seems to be intended to make it unlawful for a party, other than the owner, to use the trade mark, or any imitation of it, even upon articles ostensibly manufactured and sold by himself, as his own, for the manifest purpose of representing them to be of the "*same kind, character or quality*," as the articles manufactured and sold by the owner of the trade mark. If this is not the meaning of the provision, it is difficult to give any meaning to it. The object would seem to be, where one party has acquired a reputation for his wares, to prevent another party, who has a right to make and sell the same wares in his own name, from availing himself of the reputation which the same article has acquired through the labors and at the expense of the party originally making and vending it. Thus the plaintiff's "Concentrated Erasive Washing Powder," may, after years of labor, and by means of a large expenditure of money, have become generally and extensively known and used, and have acquired a great reputation as a useful and valuable compound. Yet the public feel no interest in the proprietor, and it is a matter of no consequence to it, whether the article is made or vended by him, or some other party, or under one name, or another. All the public cares

to know, is, that it gets the article possessing the identical qualities, and whether it is made by the original manufacturer, or somebody else, or under the original, or some other name, is not a matter of the slightest concern. Now, if the defendants' article presents the same appearance, is accompanied by a label giving precisely the same directions for its use, and other descriptive matter, showing that it is used for precisely the same purposes, possesses precisely the same qualities, and produces exactly the same effects, the public would be justified in believing, and probably would believe, that it was the identical article manufactured by another party, under another name, and purchase it as such. If found to answer the same purpose, of course, those having occasion to purchase would as soon have one manufacture as the other. In this way the defendants would as effectually avail themselves of the reputation of the original manufacturer, who has spent years of his time, and large sums of money to establish it, to the great injury of such original maker, as if he had adopted the name, and more conspicuous features of the trade mark, and sold his own compound to the public in the name, and as the compound, of the said first manufacturer. The provision of the statute last cited seems designed to prevent one man from, in any form, availing himself of, or trading upon, the dearly bought reputation of another's wares. It seeks to secure to the party establishing by his labor, money and personal energy, a reputation for his manufactures, the exclusive benefit of such reputation. It does not prevent, or attempt to prevent, any party from making or vending in his own way, any article in which no other has an exclusive right of property; but it does prohibit him from availing himself of the reputation established by another by using any peculiar name, letters, marks, device, figures, or other trade mark or name adopted by such other party in the mode prescribed, and "cut, stamped, cast or engraved upon, or in any manner attached to, or connected with, any article or covering or wrapping thereof, manufactured or sold by him, to designate it as an article of

a peculiar kind, character or quality  *  *  *  for the purpose of representing any article  *  *  *  to be of the same kind, character or quality as that manufactured or sold by the person rightfully using such trade mark or name." He may manufacture and sell the same article, adopt his own name, or device, give his own description of its virtues, and directions. for its use; but he is not to use the same name, mark, device, etc., adopted by another in the mode provided *for the purpose of showing it to be, in fact, the same thing, and deriving profit, not from the article alone, but also from the reputation of the article, established by another.* It was, doubtless, upon this view, that this statutory provision was adopted. The provision, perhaps, goes beyond the law, as it before stood, but thus the law is written. The case of *Coffeen* v. *Brunton,* 4 McLean, 516, however, only falls short of the statutory provision in the alleged element of falsehood. Mr. Justice McLean says: "In the case under consideration, in his label, the plaintiff calls his medicine the ' *Chinese* Liniment;' the defendant calls his the ' *Ohio* Liniment;' but *from the body of the label and of the directions for the use of the medicines,* it is clear that the *language of the defendant is so assimilated to that of the plaintiff as to appear to be the same medicine, the alterations being only colorable.* There would seem to be no doubt that the *intention of Loree,* who prepared the liniment sold by the defendant, as his agent, *was to avail himself of the favorable reputation acquired by the ' Chinese Liniment,'* in the sale of his; and by most persons it would be received as the same medicine. From the *handbill* published by Loree, the medicine sold by him is asserted to contain the *qualities or ingredients of the ' Chinese Liniment,'* and some other ingredient which renders it more efficacious. In his · bill the plaintiff avers that this allegation is false, and especially in saying that the 'Ohio Liniment' contains the ingredients of which the 'Chinese Liniment' is composed. The case is considered as coming within the principles above cited, and an injunction is granted to enjoin the defendant from using

11

the *label or directions accompanying the liniment* he sells, as aforesaid, *or other labels or directions, or any advertisements or handbills representing the same words or sentences which are used by the complainant in his label and directions, and which tend to produce an impression on the purchaser and the public that the liniment sold by the defendant contains the same ingredients as the ' Chinese Liniment,' and is, in effect, the same medicine.*" (See also *Burnet* v. *Phalon,* 9 Bosw. 192; and *Smith* v. *Woodruff,* 48 Barb. 438, to the same effect; also, *Newman* v. *Alvord,* 49 Barb. 494, and *Knott* v. *Morgan,* 2 Keen, 213.)

So in this case, "from the body of the label and directions for the use" of the compound, "it is clear that the language of the defendant is so assimilated to that of the plaintiff as to appear to be the same" compound. Can there be any doubt that the verbatim copy of the entire label of plaintiff, except the heading, the name of the maker and place of manufacture, and adopting it as the label of the defendant, was done for *the purpose of inducing the public to believe that the defendants' compound was precisely the same thing as, and possessed the identical properties of, the compound manufactured and sold by the plaintiffs, and for the purpose of availing themselves of the reputation established by the plaintiffs?* Or that the desired impression would be made, and the contemplated results to a greater or less extent be attained? Admitting the truth of the matters stated in the label, it is manifest that the two compounds are substantially the same, and in all respects serve the same purpose, and the exact copy of the entire body of plaintiffs' label, showing the properties and mode of use, very *strongly indicate a purpose to represent to the public that the two compounds were of the "same kind, character or quality."* As to this part of the label I think it within the statutory provision, and being so, section eleven authorizes the Court to enjoin its use. It is said, however, that the defendants are entitled to make and vend their compound, and if so, they are entitled to describe its properties and give directions for its use; that the language of the label is as applicable to their compound as to the plaintiffs'. This may

be so.   But the poverty of the English language is not so abject that it is necessary for them to copy, or palpably imitate, the label of the plaintiffs in order to accomplish all their lawful purposes.   The ordinary words of the language are open to the use of all.   It is only their peculiar arrangement and combination, with reference to a particular subject matter, that they are prohibited from copying or imitating, or using for an unlawful purpose.   Other language, or other combinations or arrangements, may be employed to indicate the purpose for which their compound may be used, and the mode of use, without suggesting an identity with plaintiffs' compound.   They are only prohibited from copying or imitating the plaintiffs' label *for the purpose of representing their compound as being the same thing, or something of the "same kind, character or quality" as the plaintiffs'*.   If they can copy or imitate the plaintiffs' arrangement of the language of the label so as to make it palpable that their compound is the same thing, of the identical kind, character, or quality, then the provision of the statute under consideration is nugatory. There may be instances where the directions are brief in which it would be difficult to avoid some similarity; but the *question is, whether the words are used in good faith without reference to any other use of the same or similar words, or whether there is a willful design to imitate for the purpose of availing oneself of the reputation established by another;* and, in this case, the latter purpose is palpably manifest in the portion of the label now under consideration.

Upon the pleadings a proper case for retaining the injunction, in part at least, appears without considering the affidavit filed in response to the answer.   I do not think all the equities of the complaint were denied by the answer.   The manufacture and sale of the compound enveloped with the label copied bodily, except the heading, name of maker and place of manufacture, is admitted.   I think, with Mr. Upton, the better doctrine to be, that "whenever upon the face of a label, or trade mark, it appears to have been the manifest design to effect a similitude with an original trade mark so

that deception may result, and the goods of the imitator be, thereby, sold as and for those of the true owner of the trade mark, whether such deception might or might not be avoided by the exercise of ordinary attention and prudence, an injunction should issue." (Upton on Trade Marks, 222, 227, 183.) And if the statutory provision under consideration may be regarded as extending the protection of the law to a case not before embraced within the rule, the same principle must apply, when upon the face of the label it appears to have been a manifest design of the imitator to represent his compound to be of the "same kind, character, or quality" as that of the owner of the trade mark copied or imitated.

The injunction is, however, too broad. It might possibly be construed, though probably not so intended, as restraining defendants from selling their compound. This is not admissible. They should, in my opinion, be restrained from selling the compound while bearing the defendants' label in its present form, or any other label having upon it the plaintiffs' trade mark, or any substantial portion of it, or any similar trade mark, or similar portion thereof. And they should be restrained from using in any way the defendants' label in its present form, or any label having upon it the plaintiffs' trade mark, or any portion of plaintiffs' trade mark, or that portion of plaintiffs' label copied into defendants' label. The defendants, however, should not be restrained from using the heading found in their label, or the name adopted by them, or the portion showing where, and by whom, their compound is manufactured, either alone or upon some other label devised by them, which shall not be an infringement upon, or imitation of, plaintiffs' trade mark, or label.