[Civ. No. 5829. First Appellate District, Division Two.—July 19, 1927.]

SUN–MAID RAISIN GROWERS OF CALIFORNIA et al., Respondents, v. MOSES P. MOSESIAN et al., Appellants.

Francis J. Heney for Appellants.

John H. Miller, A. W. Boyken and F. G. Athearn for Respondents.

THOMPSON (R. L.), P. J., *pro tem.*—This is an appeal from a preliminary injunction restraining the appellants from infringing upon certain trademarks.

For the past fifteen years respondents have been engaged in the business of producing, packing, and marketing raisins, with their principal place of business at Fresno. The Sun-Maid Raisin Growers of California is a co-operative association composed of some sixteen thousand members. During the ten years prior to the alleged infringement this association handled a raisin business aggregating $155,000,000 in value, which included seventy-five per cent of the entire raisin grape industry of California, and in this period of time it expended some $10,000,000 for advertising purposes. Its raisin products were largely marketed in one-pound cartons displaying the trademarks, the infringement of which is here involved.

These trademarks consist of a label for raisin containers, on each side of which there appears, over a bright red background, a brilliant golden orb representing the sun, which occupies the upper portion of the carton. Across the face of the sun appears the features and bust of a laughing, curly-haired girl, wearing a red sunbonnet. In her hands the maiden holds a tray laden with grapes. Below this picture, in conspicuous white letters, is printed the following language: "California Sun-Maid Seedless Raisins."

These trademarks were exclusively appropriated and used by respondents for many years. About 1918 the picture and the compound word "sun-maid" were separately and jointly registered in the United States patent office. In 1924 the appellants, who were also engaged in the raisin business in California, produced a label for their one-pound raisin car-

tons very closely resembling in color, picture, and lettering the trademarks of respondents. With this label the appellants proceeded to market their raisin products, until they were enjoined by respondents. Appellants also filed their label with the United States patent office, but its adoption was contested, and it has not been recorded.

The dominant features of the respective cartons are a picture of radiant youth over the face of a glowing golden sun, together with white lettering emphasizing the words "sunrayed raisins," which appear upon the appellants' package in lieu of "sun-maid raisins" on respondents' containers; both pictures occupy approximately the same space and relative position on each side of the respective cartons. All these features appear over a bright red background of the same shade. The similarity in the general appearance of both labels is persuasive evidence that the original trademarks of respondents inspired the production of the appellants' designs, which were evidently created with the hope of profiting by the favorable reputation and extensive advertising of respondents' products.

Notwithstanding the similarity in colors, picture, and language, appellants seek to distinguish their label from that of respondents by the use of the features of a smiling, bareheaded boy over the face of the sun, instead of the laughing red-sunbonnet girl; and in the use of the term "sunrayed" to describe the process of curing the grapes instead of "sun-maid" which is employed by respondents. On the face of respondents' carton there is printed in conspicuous white letters "California Sun-Maid Seedless Raisins," while the firm name is printed on the end of the container. On the face of appellants' carton there is printed in prominent white letters "Sunrayed Raisins, Grown Without Seeds," in addition to which there also appears in inconspicuous yellow letters the following language: "Thompson Seedless" and "Recleaned and packed by California Seedless Raisin Co., Fresno, California, U. S. A."

This suit was brought by respondents for infringement of their trademarks above described and for unfair competition. The complaint contains four counts; the first alleges an infringement against the registered trademark consisting of the picture upon a red background of the laughing, red-sunbonnet girl and the radiant sun; the second count sets up an infringe-

ment against the separately registered trademark of the compound word "sun-maid"; the third count charges infringement against the entire combination of colors, picture, and language; the last count accuses appellants of unfair competition. Upon a hearing based on affidavits the trial court granted a preliminary injunction against the appellants, and their representatives, successors, and assigns, restraining them from "preparing, packing, marketing, advertising, selling or offering for sale packages or cartons containing raisins, or raisin products in packages or cartons identical with or substantially similar to that shown in Exhibit 'E' attached to the complaint herein, the same being generally packages or cartons having thereon the name 'sunrayed' or with the figure of a boy with the sun at his back. . . . "

Appellants seek to vacate or modify this restraining order, asserting that their trademarks do not constitute an infringement, and that respondents have failed to specifically allege or prove actual fraud, deceit, or sales to any individual who was misled or induced to purchase cartons of raisins which he did not intend or wish to buy. Analyzing and distinguishing their picture and the language printed upon their containers, the appellants claim that respondents have no prior or exclusive right to the use of a red background with white letters printed thereon, nor to the combination of colors employed, nor to the picture of the sun. And, finally, appellants maintain that the word "sun-maid" as it is used by respondents is deceiving and misleading, and when correctly spelled *sunmade*, according to the evident intent expressed by the picture, it is merely a term common to the trade, describing the natural process of drying and curing the raisins.

Section 991 of the Civil Code provides: "One who produces or deals in a particular thing, or conducts a particular business, may appropriate to his exclusive use, as a trademark, any form, symbol, or name which has not been so appropriated by another, to designate the origin or ownership thereof; but he cannot exclusively appropriate any designation, or part of a designation, which relates only to the name, quality, or the description of the thing or business, or the place where the thing is produced, or the business is carried on."

■ It is true that the use of terms which are merely descriptive of the manner or process by which, or the ingredients with which, an article is made is not subject to registration and will not be protected against infringement, particularly where the process is open to the use of the general public. (L. R. A. 1916E, p. 633.) ■ Arbitrary or fanciful words have a special significance in the language of the law of trademarks, and such terms are subject to registration and appropriate protection. But in the case of *Indurated Fibre Co.* v. *Amoskeag Indurated Fibre Co.*, 37 Fed. 695, it is said: (Where such words) "do not sufficiently point either by themselves or by association to the origin, manufacture or ownership of the article produced, but that they rather indicate the quality, class, grade, or style of such article," they are not subject to exclusive use. (*Goodyear Co.* v. *Goodyear Rubber Co.*, 128 U. S. 598 [32 L. Ed. 535, 9 Sup. Ct. Rep. 166, see, also, Rose's U. S. Notes]; *Falkinburg* v. *Lucy*, 35 Cal. 52 [95 Am. Dec. 76]; *Schmidt* v. *Brieg*, 100 Cal. 672 [22 L. R. A. 790, 35 Pac. 623]; *Spieker* v. *Lash*, 102 Cal. 38 [36 Pac. 362].)

It is also true that language which is merely descriptive of the process of manufacturing is not susceptible of exclusive appropriation. (L. R. A. 1916E, 633.) This rule has been applied to the following language: Hot forged hammer point nails, shredded whole wheat, Oriental Rug Renovating Co., lamb-knit, compressed yeast, flaked oatmeal, prime leaf lard.

It has been held that "a generic or descriptive word cannot be made a valid trade-mark by misspelling it (as for example 'Kid Knee Kure' as applied to medicine), or by printing it in letters from the alphabet of a foreign language." (Hopkins on Trade-Marks, 4th ed., 95.) Mr. Justice McKenna said in *Standard Paint Co.* v. *Trinidad Asphalt Mfg. Co.*, 220 U. S. 446 [55 L. Ed. 536, 31 Sup. Ct. Rep. 456, see, also, Rose's U. S. Notes]: "The word [Rubberoid], therefore, is descriptive, not indicative of the origin or ownership of the goods; and, being of that quality, we cannot admit that it loses such quality and becomes arbitrary by being misspelled. Bad orthography has not yet become so rare or so easily detected as to make a word the arbitrary sign of something else than its conventional meaning."

■ The mere size and shape of a carton for the marketing of a product is not subject to exclusive appropriation,

492

nor is the use of a particular color or combination of colors susceptible of registration. (*Southern Cal. F. Co.* v. *White Star C. Co.*, 45 Cal. App. 426 [187 Pac. 981]; *American Tobacco Co.* v. *Globe Tobacco Co.*, 193 Fed. 1015.) ■ Nor may one ordinarily monopolize, by picture or word, the use of the sun. (*Patton Paint Co.* v. *Sunset Paint Co.*, 290 Fed. 323, 53 App. Dec. 348.)

■ Following the foregoing well-established rule, it must be conceded that language used to describe the mere method of curing grapes, or other products, such as sun-cured, sun-dried, or sun-made, are descriptive terms common to the trade, the exclusive use of which as trademarks the law will not protect. It naturally follows that the mere employment of a subterfuge or a play upon words will not suffice to escape the application of the foregoing rule. Appellants insist that the purpose of respondents' picture, taken as a whole, with the glowing sun shining upon the tray of grapes held in the hands of the smiling girl, together with the use of the words "sun-maid raisins," is a pure subterfuge intended to avoid the rule of law, and at the same time convey the impression that the raisins were in fact made or cured in the sun. On the contrary, respondents contend that both their picture and the accompanying term "sun-maid" are "purely arbitrary and fanciful creations" and that the design of the young girl holding the grapes with a "radiant golden sun" beaming down upon them "was not intended to illustrate the method of preparing raisins, but is merely pleasantly suggestive of the sunshine, beauty and abundance of our golden state of California," and that the "sun-maid" discloses an ·original, arbitrary, artistic, and appropriate design not commonly associated with the description of raisins, and as such should be given trademark protection.

It will be noted, however, that the copyrighted term employed by respondents was not in fact spelled *sunmade*. And, while it may be argued with much force that as the term was associated with the picture of the sun and the tray of grapes, it was intended to mislead a careless purchaser to assume that it implied that "sun-maid" raisins really meant *sunmade* raisins. ■ However, since the most prominent feature of respondents' picture is the smiling, curly-haired, sunbonnet girl, over the face of a radiant sun, immediately beneath which is the term "sun-maid," it does not seem

unreasonable to conclude that the compound word "sun-maid" refers to the idea of the combination of the sun and the girl, and not to an incongruous and unnatural distorting of the word, in order to construe it to mean a description of the process of curing the raisins.

■ Assuming that the word is susceptible of appellants' construction, and that there is a reasonable doubt as to the true interpretation of the idea intended to be conveyed by the picture, we are of the opinion that that doubt should be resolved in favor of the party who first appropriated the idea and exclusively used it for a number of years, and who has also succeeded in registering the term in the United States patent office, and has expended large sums of money advertising it as a trademark. (*N. K. Fairbanks Co.* v. *Ogden Packing & Provision Co.*, 220 Fed. 1002.)

■ Although the term "sun-maid," standing alone, might be subject to appellants' attack and claim that it is merely a misspelled word indicating a process of curing grapes, still as an inseparable part of a combination picture and ad, a court of equity will not draw fine distinctions to upset the discretion of a trial court in awarding a preliminary injunction where the equities are so clearly in favor of the owner of a trademark over which he has exercised exclusive control and use for a period of ten years or more.

The appellants rely upon the case of *Southern Cal. F. Co.* v. *White Star C. Co., supra,* wherein it is said: "All of the resemblances arise from features that are common to the trade, or from the use of a design—the figure of a fish—to which no one has an exclusive right. . . . Plaintiff must show deception arising from some feature of its own, not common to the public." This was an action to enjoin the sale of tuna fish, canned in tins of like size and shape common to the trade, containing a label with similar blue background, over which the only other similar feature was the picture of a fish. The conspicuous designating trademark of plaintiff consisted of the words "Blue Sea Tuna," while defendant's cans were labeled "White Star Tuna Fish." The court there said: "Except that both labels have substantially the same blue-colored background, the figure of a fish, designated to represent the tuna, and truthful, printed descriptions of the contents of the packages, *the labels of the two competitors differ in almost every other respect.*"

The following excerpt was also quoted with approval: "A resemblance which would deceive an expert or a very cautious purchaser may still give a right of action, but a resemblance which would deceive only an indifferent or careless purchaser gives no right of action." The foregoing language readily distinguishes that case from the one at bar.

■ The benefits of an exclusive trademark are to create and preserve a favorable reputation, to stimulate the sale of a product, and to distinguish it from similar competing products.

■ The granting of a preliminary injunction rests in the sound discretion of the trial court and will not be disturbed on appeal unless that discretion has been abused. (14 Cal. Jur. 180; *Lutz* v. *Western Iron & Metal Co.,* 190 Cal. 554 [213 Pac. 962]; *Wilson & Co.* v. *The Best Foods, Inc.,* 300 Fed. 484.)

A trademark may consist in the exclusive use of "any description of word, letter, device, emblem, stamp, imprint, brand, printed ticket, label or wrapper," etc. (Sec. 3196, Pol. Code.) The exclusive use of a trademark may be secured to the owner thereof by registering it with the Secretary of State. (Sec. 3197, Pol. Code.) An owner of a trademark may be protected in its use by means of injunctive relief, even though it may not be registered pursuant to law. (Sec. 3199, Pol. Code.) ■ The registration of a trademark, like the recording of any other instrument, is merely *prima facie* evidence of its validity and ownership.

■ An injunction will issue to restrain infringement upon the expression of an idea by means of a label or picture, as well as by the use of ordinary language. (24 Cal. Jur. 620; *Burke* v. *Cassin,* 45 Cal. 467 [13 Am. Rep. 204]; Rogers on Good Will, Trade-Marks, etc., p. 69; *Aunt Jemima Mills Co.* v. *Blair Milling Co.,* 270 Fed. 1021, 50 App. Dec. 281; *Enoch Morgan's Sons Co.* v. *Ward,* 152 Fed. 690 [12 L. R. A. (N. S.) 729].) The value of pictures as a means of conveying an idea has been recognized since ancient times. The caveman carried his message on the walls of his cave; the Indian boasted of his conquest in pursuit of game, or in the waging of war, by means of crude pictures cut upon the bark of a tree; the modern picture play vividly portrays the story of life in its varied forms with all its joys and sorrows,

its strife and tragic failures, as well as its wonderful achievements.

The test as to infringement against a trademark does not depend upon an exact similarity in every detail, but if the general appearance is such as to deceive a casual purchaser who exercises ordinary care in the selection of the article which he wishes to buy, its use may be enjoined. (Nims on Trade-Marks, 2d ed., pp. 235, 585; *Canterbury Candy Makers* v. *Brecht Candy Co.*, 294 Fed. 1013, 54 App. D. C. 82; *Gehl* v. *Hebe Co.*, 276 Fed. 271; *O. & W. Thum Co.* v. *Dickinson*, 46 App. D. C. 306; *National Biscuit Co.* v. *J. B. Carr Biscuit Co.*, 55 App. D. C. 146, 3 Fed. (2d) 87; *McLean* v. *Fleming*, 96 U. S. 245 [24 L. Ed. 828, see, also, Rose's U. S. Notes].) In the last case cited it is said: "What degree of resemblance is necessary to constitute an infringement is incapable of exact definition, as applicable to all cases. All that courts of justice can do, in that regard, is to say that no trader can adopt a trade-mark, so resembling that of another trader, as that ordinary purchasers, buying with ordinary caution are likely to be misled. . . . Much must depend, in every case, upon the appearance and special characteristics of the entire device; but it is safe to declare, as a general rule, that exact similitude is not required to constitute an infringement or to entitle the complaining party to protection. If the form, marks, contents, words, or the special arrangement of the same, or the general appearance of the alleged infringer's device, is such as to be likely to mislead one in the ordinary course of purchasing the goods, and induce him to suppose that he was purchasing the genuine article, then the similitude is such as entitles the injured party to equitable protection, . . . " In *Spieker* v. *Lash*, 102 Cal. 38, 45 [36 Pac. 362, 363], in which a judgment for plaintiff was affirmed, it is said: "The evidence shows that the defendants' labels, while differing in some respects from those of the plaintiff, are a colorable imitation of them, the resemblance being such as to justify the conclusion that they were intended and adapted to lead the public generally to the belief that the manufacture of the original 'Lash's Kidney and Liver Bitters', had been superseded. . . . "

Numerous authorities show a like effort to use similar words conveying the same idea, sound, or appearance, by

altering the spelling, or disarranging the sequence of letters. Among these cases the following similar words have been held to constitute an infringement: Coco-Cola—Extract of Coca & Kola; Coca-Cola—Take Kola; Holeproof—No-Hole; Lily White—White Lily; Uneeda—Iwanta (*National Biscuit Co.* v. *Baker*, 95 Fed. 135); Sapolio—Sapono; Hostetter's Bitters—Host Style Bitters; Cascarets—Castorets; Gold Bar—Gold Band; Silver Bar—Silver Band; Stove lustre—Stove lacquer; Listerine—Lis ter septine; Celluloid—Cellonite; Cottolene—Cottoleo; Cottolene—Chefolene (*N. K. Fairbanks Co.* v. *Odgen Packing & Provision Co., supra*); Gold Dust—Gold Drop (*N. K. Fairbanks Co.* v. *Luckel, King & Cake Soap Co.*, 102 Fed. 327); Beats-All—Knoxall (*American Lead Pencil Co.* v. *L. Gottlieb & Sons*, 181 Fed. 178); Keepclean—Sta-Klean; Crisco—Esco (*Proctor & Gamble Co.* v. *Eney Shortening Co.*, 50 App. D. C. 42, 267 Fed. 344).

Appellants contend that the injunction should be vacated for the reason that respondents failed to show any actual fraud or that any purchaser was deceived by the simulation, or induced to buy a brand of raisins which he did not desire.

Appellants rely upon the case of *Dunston* v. *Los Angeles Van etc. Co.*, 165 Cal. 89 [131 Pac. 115]; in which the supreme court reversed a final injunction which was issued by the trial court restraining the use of an exact duplication of a firm name by a competing company. The question of infringement upon a label or simulation of a trademark which had been conceived and exclusively appropriated was not involved. It was there said, with respect to the name "Los Angeles Van & Storage Co.": "It is too apparent to need discussion that the name here employed by plaintiff has reference in its first words to the place of business; in the remaining words to a description of the business. Such names, titles or designations are not the subject of exclusive copyright or trade-mark. . . . Since the plaintiff cannot acquire an exclusive property right in the associated words . . . any relief based upon an asserted invasion of this exclusive trade-mark is without warrant." It was then held that the judgment could not be supported on the ground of "unfair trade dealing" for the reason that deceit or fraud had been neither pleaded nor proven; that the mere similarity of the firm name was insufficient to establish fraud. In

the instant case respondents do not rely exclusively upon the doctrine of unfair trade dealing, but charge infringement upon the entire idea expressed in an original label together with an euphonic simulation of the trademark term "sun-maid." ■ The imitation of a trade label or trademark to a degree which would be likely to deceive casual purchasers exercising ordinary care in the selection of a commodity may constitute fraud in itself independent of evidence of actual sales.

The authorities are fairly uniform to the effect that it is not necessary to prove actual fraud or deception, but this may be assumed where the facts indicate that a purchaser, exercising ordinary care, would be likely to be deceived by the imitation of a trademark. (Nims on Trade-Marks, 2d ed., pp. 601, 640; *Gehl* v. *Hebe Co., supra; Bissell Chilled Plow Works* v. *T. M. Bissell Plow Co.*, 121 Fed. 357; *Wirtz* v. *Eagle Bottling Co.*, 50 N. J. Eq. 164 [24 Atl. 658]; *Von Munn* v. *Frash*, 56 Fed. 830, 837; *Florence Mfg. Co.* v. *J. C. Dowd & Co.*, 178 Fed. 73.)

In *N. K. Fairbanks Co.* v. *Luckel, King & Cake Soap Co., supra*, it is said: "It is not essential to the right of complainant to an injunction to show absolute fraud or wilful intent on the part of the respondent. Upon familiar principles, it will be presumed that the respondent contemplated the natural consequences of his own acts. If the acts of respondent in the adoption of the name 'Gold Drop' constituted an infringement of the trade-mark or trade-name of the complainant, and it was put on the market in such a manner as to interfere with the legal rights of complainant, to its loss and injury, it would be entitled to an injunction, irrespective of the question of any testimony as to actual fraud or wilful intent. The court must determine the intent from respondent's acts and the results produced thereby." And in the case of *T. A. Vulcan* v. *Myers*, 139 N. Y. 364 [34 N. E. 904], it is said: "No evidence was given or offered (in this case) to show that any person had actually been deceived by the limitation of the plaintiff's trade-mark, and we think that none was necessary for the maintenance of the action. It is the liability to deception which the remedy may be invoked to prevent. It is sufficient if injury to the plaintiff's business is threatened, or imminent to authorize the court to intervene to prevent its occurrence. The owner

is not required to wait until the wrongful use of his trademark has been continued for such a length of time as to cause some substantial pecuniary loss.''

Placing the cartons of the respective parties side by side, one is impressed with the striking similarity of appearance in size, color, design, form, and idea. The genius of a resourceful mind could scarcely have devised a combination of color, picture, and euphonious language more deceivingly similar to respondents' label than that conceived by appellants. ▮ Without a critical examination or independent knowledge of the different brands, considering the labels as a whole, an innocent purchaser, exercising ordinary care, would be quite likely to be misled by the similarity of appearance.

We think the trial court was warranted in issuing the preliminary injunction. For the foregoing reasons the order for the preliminary injunction is affirmed.

Sturtevant, J., and Nourse, J., concurred.