[Civ. No. 12804. First Dist., Div. Two. May 17, 1945.]

CALIFORNIA PRUNE AND APRICOT GROWERS' AS-SOCIATION (a Corporation), Respondent, v. THE H. R. NICHOLSON COMPANY (a Corporation), Appellant.

Kenneth A. White and Ogden, Crocker & Steelman for Appellant.

Naylor & Lassagne, James M. Naylor and Gerald H. Hagar for Respondent.

STURTEVANT, J.—The plaintiff alleged two separate counts against the defendant. It pleaded a charge that the defendant was guilty of infringing on the plaintiff's trademark and that the defendant was guilty of unlawful and unfair acts of competition. The defendant denied said allegations, and on those pleadings, among others, issue was joined and a trial was had. Later the trial court made findings in favor of the plaintiff on each material issue.

This defendant now contends that the record does not show it was guilty of infringing on plaintiff's trademark or that it was guilty of doing any unlawful or wrongful acts of competition. A complete answer is the findings are to the contrary and the record contains an abundance of evidence supporting the findings. In its brief the plaintiff sets forth separately a set of facts which it asserts shows its rights and a set of facts which it claims shows the defendant's rights. In its closing brief the defendant does not challenge the accuracy of either statement. Those two statements follow, with certain modifications.

### Plaintiff's History.

The respondent, California Prune and Apricot Growers Association, is a nonprofit, cooperative organization, formed by grower-members in the year 1922, as the outgrowth of an earlier organization, California Prune and Apricot Growers,

Inc., wherein the growers held shares of stock in proportion to the acres that they signed up.

Respondent's said predecessor was organized in 1917 and immediately adopted and commenced using the word "Sunsweet" as the principal trademark or brand to identify the goods canned, bottled, packed and processed by it. In that first year the commodities of the predecessor company were packed largely in what are called bulk 25- and 50-pound boxes, from which the retail trade served the customer with anything from one pound up that they might be seeking to purchase.

Use of the "Sunsweet" mark by respondent's predecessor in 1917 is further evidenced by a Christmas package of "Sunsweet" prunes, as an early carton pack. Further commercial use of the trademark was evidenced by a photographic reproduction of a display of "Sunsweet" prunes in a Sacramento hotel. Respondent's predecessor during its existence commenced the use of a five-pound prune carton bearing the trademark "Sunsweet."

From the inception of the business of respondent's predecessor the use of the trademark "Sunsweet" was expanded to other commodities in addition to dried prunes and apricots, and there are in evidence facsimiles of labels employed in marking such new items, including a photostatic copy of the history of respondent's predecessor's application for registration of the mark in the Patent Office, and including reproductions of labels applied to "Ready to Serve" canned prunes; fruit butter made from prunes and apricots, and a jam product which was "simply a blend of apricots with some citrus fruit ingredient." This application was filed April 28, 1921.

Cognizant from substantially the inception of its business that its products had direct relation to the preparation of beverages, the respondent, as early as 1921-22, urged and taught the ultimate consumer how to readily and simply convert "Sunsweet" prunes into a prune juice beverage, including final preparation with plain or carbonated water.

From the outset the "Sunsweet" trademark was what respondent calls its "top brand," namely, the brand under which "the highest type and quality" of its dried fruits was offered and sold to the public. The "Sunsweet" brand of goods was widely and nationally advertised even in the early years of the business as evidenced by the advertising supple-

ment to the "Sunsweet Standard," bearing date December, 1921, reporting on the past and future advertising programs and media and containing reproductions of such advertising material. Respondent's witness, Dunlap, identified the contents of said supplement as typical of the kind of advertising employed.

Expansion of respondent's "Sunsweet" business to prune juice, in its commercially bottled form, as distinguished from the early recommendation for consumer manufacture of a beverage from "Sunsweet" prunes, occurred in 1932 and might have had its inception prior to that time. It came about as a result of respondent's desire to fully utilize its available raw materials, i. e., the fruit grown by its members. One of respondent's exhibits was identified as a replica of the "Sunsweet" prune juice package employed in 1932.

At the present time the respondent itself sells "Sunsweet" prune juice in the territory west of the Transcontinental Divide. East of the dividing line "Sunsweet" prune juice is sold by a firm named Duffy-Mott by an arrangement with respondent. The arrangement contemplates the shipment of prune concentrate in 50-gallon barrels to Duffy-Mott, which processes and distributes prune juice as a finished beverage. Under the arrangement with Duffy-Mott the respondent reserves the right of supervision of the preparation of the prune juice sold under the trademark "Sunsweet"; it checks the quality; it picks up samples and they are tested in San Jose by a chemist.

As early as April 29, 1933, respondent was advertising "Sunsweet" prune juice, which it was offering for sale as a finished beverage, as shown by an advertisement in "Pacific Rural Press." Typical newspaper advertising is evidenced by one of plaintiff's exhibits covering the period October 20, 1933 to March, 1934, and another exhibit shows a full page four-color advertisement in the Saturday Evening Post, the estimated cost of which was $11,000 for a single issue. Plaintiff's Exhibit 16 is a collection of typical advertisements in various media, during the period July, 1941-June, 1943, covering various "Sunsweet" products including specific mention of "Sunsweet" prune juice.

The history and broad pattern of respondent's advertising of its "Sunsweet" products is shown in the recapitulation of

expenditures in evidence. It was explained by the witness Hendrixson, respondent's statistician, that the years 1917 and 1918 were not included in the recapitulation because of his inability to locate the exact ledgers, and his understanding that the advertising conducted by respondent's predecessor in the initial two-year period was primarily promotional in character.

In the fiscal year 1933-1934 the sum of $34,646.52 was allocated to the advertisement of "Sunsweet" prune juice; in the next succeeding fiscal year the amount was $102,139.17; the next year $129,210.86. Additionally, in 1932-1933 the sum of $13,188.28 was allocated for the allowance of 5 per cent special discounts for advertising and the next year (1933-1934) the sum was increased to $58,061.60.

Exhibits in evidence reflect the growth of respondent's business in the sale of "Sunsweet" products, namely, carton prunes, carton apricots, carton seedless raisins, carton peaches, whipped prunes and prune juice, and were based upon a study of respondent's records.

The fact of federal registration of respondent's trademark for its various commodities was proved by the introduction of printed copies (by stipulation, in lieu of certified copies). Additionally, three other registrations were proved by file histories.

Ownership of these registrations is evidenced, not alone by the admission in appellant's answer, but by the testimony of the witnesses as to succession, and certified abstracts of title relating to said registrations effected in the name of respondent's predecessor.

### DEFENDANT'S HISTORY.

The comparative chronology of the business of respondent and appellant is shown by a consideration of Plaintiff's Exhibit 42, "Title Chart on 'Nicholson's Sunsweet' Trade Mark," which was admitted without objection, for which reason it may be assumed to correctly state the facts.

*The Ver-Vac Company:*

The incorporation of The Ver-Vac Company, a Maryland corporation, on December 19, 1919, was proved. It was this corporation (and not H. R. Nicholson, the individual) which originally made application to the Patent Office for registration of the trademark "Sun Sweet" for nonalcoholic, maltless,

concentrated and nonconcentrated fruit syrup used for making soft drinks, on April 5, 1922 and, when registration of that mark was denied, converted the application into one seeking registration of the mark "Nicholson's Sunsweet." In its verified application it was alleged that: "The trade mark has been continuously used in the business of said corporation since March 31, 1922."

In attempting to carry appellant's date of first use of the trademark "Nicholson's Sunsweet" back of the date sworn to in the federal application, i. e., March 31, 1922, the evidence tendered consisted of the testimony of appellant's witnesses as to their recollections unsupported by documentary evidence.

The documentary evidence and the admissions of appellant's witnesses under cross-examination raise a question as to whether the date of first use, namely, March 31, 1922, may be relied upon. The file history in evidence of appellant's federal application, contains a label specimen bearing the diagonally printed statement "Temporary Label." The words "Nicholson's Sunsweet Orange Concentrates" were printed on a separate strip pasted at the top of the label, over the words "Pure Fruit Orange Concentrate." This "label" was represented in appellant's federal application as a specimen of the label actually affixed to the goods or containers thereof, and yet in the cross-examination of Mr. Nicholson, appellant's principal witness, the following statements appear: "Q. In other words, the label forming the part of Plaintiff's Exhibit 23 was prepared especially for the purposes of the application? A. I imagine so. Q. It is not, is it, a label such as you would use in ordinary commerce? A. No, sir."

The nearest approach in appellant's proofs to a showing of the earliest actual commercial use of the notation "Nicholson's Sunsweet" by the Ver-Vac Company, aside from the recollections of the witnesses, is found in the records concerning purchase of bottle crowns. One of defendant's exhibits, the card records of The Crown Cork & Seal Co., shows approval of a sketch of "Nicholson's Sunsweet" crown by "Shipley Steam Bottling Works," as the customer, bearing date of May 5, 1923, or some six years subsequent to respondent's first use of its mark "Sunsweet" in 1917.

No attempt was made by appellant to give the figures or show the records upon which to approximate the business of

The Ver-Vac Company, and consequently we can merely surmise as to the volume of business done by that company. From defendant's Exhibits J and K we find that on April 3, 1924, North Ontario Packing Co., of Los Angeles, California, shipped 60 barrels of double strength ''Cal-Ora,'' valued at $4,169.52 to The Ver-Vac Company. ''Cal-Ora'' was the name used by the shipper to indicate the goods ''California Orange.'' There was no evidence offered, however, to show that these raw materials found their way to the bottlers under the trademarks ''Nicholson's Sunsweet'' or ''Sunsweet.'' According to the formula given by Mr. Nicholson for the manufacture of the bottler's base, the 60 barrels of double strength concentrate did not represent any great volume of business.

From the record it appears that the business of The Ver-Vac Company consisted of preparing a bottler's concentrate of fruit juices by adding water and sugar thereto and selling the same to a limited number of customers. No advertisement of the product of The Ver-Vac Company was shown, from which the respondent argues that the business was both local and small in size. It was also short-lived for the charter was forfeited February 13, 1926, for nonpayment of taxes.

*The Ver-Vac Products Company:*

This company was incorporated under the laws of the State of Maryland on May 7, 1924, and voluntarily dissolved on March 24, 1937.

On June 10, 1924, it caused an assignment to be recorded at the Patent Office, purporting to have been executed May 31, 1924, and to transfer the trademark ''Nicholson's Sunsweet'' and the registration thereof, from The Ver-Vac Company to The Ver-Vac Products Company. The circumstances surrounding this transfer are not shown; the records have been destroyed.

On the basis of oral testimony and documentary material in the record, it is evident that nothing more than nominal use was made of the trademark ''Nicholson's Sunsweet'' during the life of The Ver-Vac Products Company.

The very earliest documentation of business activity by The Ver-Vac Products Company, as shown by the record, was the purchase of fifteen 49-gallon barrels of orange concentrate from North Ontario Packing Co. on July 22, 1925. An idea of the volume of business resulting therefrom to The

Ver-Vac Products Company may be gained by reference to the formula previously given by the witness Nicholson.

Documents introduced by the appellant consisting of invoices and delivery receipts spanning the years April 8, 1929, to August 16, 1935, indicate that the sales of orange concentrate under the trademark "Nicholson's Sunsweet" were in extremely small volume and that the business was far from a growing and thriving enterprise. The oral testimony of witnesses, who admittedly had never examined the records of the company, that greater volume was enjoyed, cannot change the quantum aspect of the pictures, especially where the testimony was given many years after the event.

It may be true that The Ver-Vac Products Company used labels and advertising banners, but the record is silent as to the extent of such use from which the volume of business could be deduced.

During its existence (1924-37) The Ver-Vac Products Company made certain changes with respect to the bottle crowns employed by the bottlers of its products, and the chronology of these changes, as nearly as they can be determined, ran something like this:

1. Defendant's Exhibit B, dated March 27, 1930, represented the dropping of the prefix word "Nicholson's" from the combination "Nicholson's Sunsweet," while retaining the embellishments of Defendant's Exhibit A.

2. Defendant's Exhibits Y-2 and Y-4 represent the use of the word "Nichol" as a prefix for the word "Sunsweet."

3. Defendant's Exhibits Y and Y-3 are bottle crowns bearing the word "Sunsweet" in a circular arrangement with the names of the particular fruit flavors, as orangeade and lemonade, respectively.

4. Defendant's Exhibit Y-1 is a "privately designed crown" bearing the word "Sunsweet" with an associated sunburst and delivery boy design.

The dates of these changes are not made certain by the oral testimony or documentary evidence adduced on behalf of appellant. However, up to the year 1930 the marks "Nicholson's Sunsweet" and "Nichol Sunsweet" were used, and "Sunsweet" came into being in 1930 as a denomination of the product of The Ver-Vac Products Company. Whatever else these changes may suggest they are satisfactory evidence that the use of the word "Sunsweet," alone or in combina-

tion with other words or with designs, as a trademark, lacked stability in the business being done by The Ver-Vac Products Company during the period of its existence and that from 1924 to 1937 The Ver-Vac Products Company had no permanent brand or mark for its goods.

The most significant characterization of the business of The Ver-Vac Products Company is found in the bill of sale to appellant. This instrument was executed April 17, 1937 (after dissolution of the seller on March 24, 1937). The property conveyed as a ''going business'' consisted of some sixty items, ranging from ''15 gal. sarsaparilla flavor'' to ''1 Ford 1929 delivery.'' It included only ''2 gal. orange conc.'' (meaning two gallons of orange concentrate), the product in which The Ver-Vac Products Company was supposed to be doing business and in connection with the sale of which it was supposed to be using the trademark ''Sunsweet.''

The price paid for the property of The Ver-Vac Products Company was the sum of $221.85 and for the added consideration of $1.00 there were transferred accounts receivable totalling $212.78. The bill of sale contains no specific reference to ''good will'' of the business.

*The H. R. Nicholson Company:*

The appellant company succeeded to the business of The Ver-Vac Products Company, acquiring its sixty-item inventory of assets through the bill of sale already referred to.

Insofar as appellant's acquisition of the registered trademark ''Nicholson's Sunsweet'' is concerned, there is uncertainty in the official record. One of plaintiff's exhibits shows an assignment dated March 14, 1938, and recorded April 11, 1938, from The Ver-Vac Company to appellant, notwithstanding earlier conveyance of its interest in the trademark to The Ver-Vac Products Company and the fact that it had been dissolved on February 13, 1926, or some twelve years previously for nonpayment of its taxes.

On December 2, 1942, some six months after the commencement of this action, appellant recorded in the Patent Office a purported assignment, acknowledged April 17, 1937, transferring the trademark from The Ver-Vac Products Company to appellant. The assignment of April 17, 1937, was executed after dissolution of the assignor company and purported to convey the trademark and ''good will'' despite the fact that the bill of sale failed to transfer good will as one of the assets

of The Ver-Vac Products Company along with the sixty items of property specifically identified therein.

Among the things done since its inception in 1937, appellant claims to have employed a label bearing the words "Nicholson's Sunsweet" as a trademark for orange concentrate sold to bottlers despite the fact that The Ver-Vac Products Company, had, in the year 1930, dropped the prefix word "Nicholson's" in favor of "Nichol Sunsweet" and "Sunsweet" alone.

The first tangible evidence of use of the word "Sunsweet" by appellant is in the introduction of the applied color label bottle. Here the word "Sunsweet" and indeed all other label matter, is processed as a permanent part of the bottle itself. This bottle was apparently introduced to defendant's customers at about the same time it was offered to The H. R. Nicholson Company, the California copartnership, as a part of the transaction of January 6, 1941.

In these particulars the record shows that appellant has used "Nicholson's Sunsweet" and "Sunsweet" interchangeably and without any fixed pattern, as its predecessors had done.

Up to January, 1943, the date of the government order freezing the manufacture and sale of concentrated citrus juices, the appellant conducted its business along the following lines:

Appellant, itself, does not manufacture concentrates made from citrus juices; it merely distributes to bottlers concentrates made by others. The concentrates thus distributed are orange, lemon, grapefruit and grape. It has an agreement with Mutual Orange Distributors, of Anaheim, California, giving it the exclusive right to distribute to bottlers of carbonated beverages the concentrates manufactured by Mutual Orange Distributors.

The concentrates shipped by Mutual Orange Distributors were packed in gallon cans, six to the carton, each can bearing a "Sunsweet" label and the labels were applied by Mutual Orange Distributors. Each of these labels bore mixing instructions and the notation "Distributed by H. R. Nicholson Company, Baltimore, Maryland, Chicago, Illinois, San Pedro, Calif." These labels were applied to "all shipments," which would include shipments on orders from "The H. R. Nichol-

son Company, San Pedro, California'' or ''The H. R. Nicholson Company, Chicago, Illinois.''

In addition to the labels just referred to appellant has employed the ''Nicholson Sunsweet'' label in connection with samples sent to the trade  The label carries directions for making plain or carbonated water punch bowl beverages, water ice and sherbets and cake icings from the concentrates to which it was applied.  They were printed in ''quantities of possibly ten or fifteen thousand, or something like that'' as a fairly widespread recommendation by appellant that its concentrates were useful and to be used for making products other than carbonated beverages.

With respect to soft drinks sold in bottles it is the appellant's practice to let the bottler furnish his own bottles and purchase the crowns from the appellant.

The labels were made ''for bottlers of carbonated beverages who did not care to go to the expense of buying what we called a color applied label bottle.''

■ The defendant commences its brief by stating a number of academic arguments discussing at length certain propositions claimed to be rules of law applicable to such actions. In its fifth point it finally contends that certain findings (referring to them by their respective numbers) are not sustained by the evidence.  It then refers back to said discussions of legal propositions as sustaining its contention that said findings are not sustained by the evidence.  As we understand the defendant it seeks by both methods to show that the facts proved were legally insufficient to support said findings.  As we proceed we will examine each finding so attacked by the defendant and give it such consideration as we think should be given to it, but we will not go through a long record consisting of 370 pages of typewritten transcripts and more than a hundred exhibits and attempt to find error in the record.

■ The defendant asserts that the evidence shows it is engaged in processing certain fruit juices and selling wholesale the product for making ''soda pop'' and other beverages, whereas the plaintiff is engaged in processing prunes and preparing them for consumption as food.  Such being the facts the defendant asserts there is not and cannot be any competition or infringement.  That contention presents mixed questions of fact and law.  ■ As to all questions of fact involved this court and the parties are bound by the findings.

Those findings are supported by the evidence hereinabove set forth. Commencing in 1922 the defendant and its predecessors were engaged in marketing fruit juices for beverage purposes. During that same period the plaintiff was engaged in processing prunes which could be used for food or for making prune juice.

As shown by the facts hereinabove set forth the defendant was using and claiming the right to use trademarks very similar to those used by the plaintiff. The trial court found the facts in favor of the plaintiff and against the defendant. That ruling will not be disturbed unless the trial court abused its discretion. (*Sun-Maid Raisin Growers* v. *Mosesian,* 84 Cal.App. 485, 494 [258 P. 630].) Addressing ourselves to the first count of plaintiff's complaint pleading infringement of trademarks, it was not necessary that the plaintiff should prove actual confusion of goods. (*Del Monte Special Food Co.* v. *California Packing Corporation,* 34 F.2d 774, 775; *Henry Muhs Co.* v. *Farm Craft Foods,* 37 F.Supp. 1013, 1015.) Addressing ourselves to the second count of plaintiff's complaint pleading unfair competition, the rule is the same. (24 Cal.Jur. 630; Rest., Torts, § 728; *Hoover Co.* v. *Groger,* 12 Cal.App.2d 417, 419 [55 P.2d 529].) The finding of the trial court that defendant's acts constituted unlawful competition was therefore sustained by the evidence.

Closely allied to the last point the defendant contends that its products and the products of the plaintiff were not of the same "descriptive properties." Under the facts hereinabove recited we think the point must be ruled against the defendant. (*Four Roses Products Co.* v. *Small Grain Distilling & Drug Co.,* 29 F.2d 959 [58 App.D.C. 299].) In that case the court held, quoting the first syllabus, "A malt syrup, intended for and actually used in home brew of alcoholic content, *held* as bearing on right to registration of trade-mark, within the meaning of the Trade Mark Act (15 USCA sec. 81 et seq.), to be of the same descriptive properties as whisky." Toward the end of that decision the court said: "As we have many times observed, the trade-mark registration act was designed to prevent and not to promote misrepresentation. The Patent Office, therefore, would have been justified in refusing appellant's application, quite apart from the opposition of the appellee." (See, also, *California Fruit Growers Exch.* v. *Windsor Beverages,* 118 F.2d 149.)

The defendant cites and relies on *John Sexton & Co.* v. *Schoenhofen Co.*, 273 F. 327 [50 App.D.C. 363]. It is not in point. It held that grape juice, a fruit beverage, and ginger ale or root beer, cereal beverages, are not goods of the same descriptive properties. But in the instant case the goods sold by the plaintiff and those sold by the defendant were both fruit juices. It is manifest that they were of the same descriptive properties.

As applicable to the two points we have just discussed the defendant cites and relies on *France Milling Co.* v. *Washburn-Crosby Co.*, 7 F.2d 304. Because the facts are so different we do not consider the case helpful. Commencing in 1880 the defendant Washburn had built up a flour business. It sold its flour in barrels and bags. It sold under the name "Gold Medal." Among other customers it sold large quantities to the plaintiff. The plaintiff mixed the flour it purchased with certain ingredients and sold its flour for making pancakes. In 1904 it was awarded a gold medal prize at the Louisiana Purchase Exposition. Thereafter it used on its product the brand "Gold Medal." Business was so conducted down to the year 1923. At that time rumors reached France that Washburn intended to make a prepared flour and sell it under the name of "Gold Medal." France protested. In 1923 Washburn registered in the Patent Office the phrase "Gold Medal" as a trade name. In 1924 France petitioned the Patent Office to cancel said registration. Such registration "was cancelled by agreement." The record does not disclose that France ever applied for registration. Having set forth distinctly the foregoing facts, the court said (p. 305): "We likewise lay aside all arguments based on registration of marks; these litigants must both stand on what are usually (and not very accurately) called their 'common law' rights, aided by such equities derived from conduct and lapse of time as may serve them." Thereupon the court held that France was properly awarded a decree enjoining Washburn from using "Gold Medal" on its prepared flour.

The distinctions made by the defendant are not sound. The correct test to be applied was stated in *Sun-Maid Raisin Growers* v. *Mosesian*, 84 Cal.App. 485 [258 P. 630]. In that case, at page 497, the court said: "The authorities are fairly uniform to the effect that it is not necessary to prove actual fraud or deception, but this may be assumed where the facts indicate that a purchaser, exercising ordinary care, would be likely to be deceived by the imitation of a trademark."

In *Del Monte Special Food Co.* v. *California Packing Corporation,* 34 F.2d 774, at page 775, the court said: ''The injury to the appellee by the use of the Del Monte Brand by the appellant does not result from preventing sale by appellee of oleomargarine of its own, but from a representation to the public that it produces a product which it does not in fact produce and over which it has no control. Its reputation for quality is therefore placed to some extent in the hands of a corporation who owes it no allegiance and has no concern in maintaining the high reputation established by the appellee, and who may utilize that reputation to sell the public an inferior production. Thus every effort made by the appellee to increase the volume and variety of its products and maintain its high standard of quality by its systematic and expensive advertising campaign and by care in the preparation of its products redound to the benefit of the appellant, which does not contribute in any manner to the expenditures involved in this vast undertaking, and whose only motive for the adoption of the same 'brand' is to get the advantage of appellee's name, reputation, and good will. The law of unfair competition has resulted from the application of a simple proposition to the extension and modern development of manufacturing and merchandising. The principle may be expressed in the language used by the various courts when dealing with the subject of unfair competition, as follows: 'That nobody has any right to represent his goods as the goods of somebody else.' ''

The mere fact that the registrations of the plaintiff in the Patent Office were made under class 46 whereas the defendant's registration was made under class 45 is not necessarily determinative. In *Henry Muhs Co.* v. *Farm Craft Foods,* 37 F.Supp. 1013, at page 1015, the court said: ''The modern doctrine is certainly to grant, to one who has established a trade mark and good will in connection therewith, the use thereof *in any reasonable extension* of its business. *Aunt Jemima Mills Co.* v. *Rigney & Co.,* 2 Cir., 247 F. 407 [159 C.C.A. 461, L.R.A. 1918-C 1039]; *Waterman Co.* v. *Gordon,* 2 Cir., 72 F.2d 272; *Yale Electric Corp.* v. *Robertson,* 2 Cir., 26 F.2d 972.'' (Italics ours.) And in *California Fruit Growers Exch.* v. *Windsor Beverages,* 118 F.2d 149, 152, the court said: ''From these and other precedents we conclude that it is now settled in this country that *a trade mark protects the owner against not only its use upon the*

*articles to which he has applied it but also upon such other articles as might naturally or reasonably be supposed to come from him. Protection extends to all goods of the same class even though the alleged infringement is not upon the same species of articles.''* (Italics ours.) Such rules were specifically applied in *Sun-Maid Raisin Growers* v. *Mosesian,* 84 Cal.App. 485 [258 P. 630]. As stated with approval in *California Fruit Growers Exch.* v. *Windsor Beverages, supra,* at page 152: ''The real test is whether the use of identical or similar trade marks would be likely to cause confusion or mistake in the minds of the public, to deceive purchasers,— where the challenged goods are sold in the same stores or distributed in the same manner. Here confusion is bound to result. It was the congressional intent to prevent such confusion and resulting mistake or deceit. Though the merchandise of others may be dissimilar, if the trade mark is the same or similar, and the merchandise such as reasonably may be attributed to plaintiffs, deceit results. *Decker & Cohn, Inc.* v. *S. Liebovitz Sons, Inc.,* 46 F.2d 179; *Goodrich Co.* v. *Hockmeyer,* 40 F.2d 99. Surely bottled beverages bearing the name Sunkist belong to the same general class of merchandise as bottled fruit and vegetable juices sold under the same name. As Judge Baker said, speaking for this court, in *Church & Dwight Co.* v. *Russ,* 99 F.276, 280, 'Goods are in the same class whenever the use of a given trade mark or symbol or both would enable an unscrupulous dealer readily to palm off on the unsuspecting purchaser the goods of the infringer as the goods made by the owner of the trade mark, or with his authority and consent.' '' All of the facts being considered it is plain that the products of the plaintiff and those of the defendant are of the same class and descriptive properties.

In its next point the defendant claims it holds a valid trademark, properly registered, and that it has made a *continuous* and *prior* use of it. The vice in this claim is that it is not supported by the facts. The record shows that one of the defendant's predecessors applied for permission to register ''Sunsweet'' as a trademark. Its application was refused and such predecessor changed its application and applied for and was given a registration as ''Nicholson's Sunsweet.'' Said predecessor was never given a registration as ''Sunsweet.'' Neither was the defendant nor any of its predecessors. Nevertheless, the defendant and some of its

predecessors have, without registry rights, or any rights, used the trademark "Sunsweet." Such use, in the teeth of the registration laws, created no right in the defendant nor in the predecessors of defendant. (*Straus* v. *Notaseme Co.*, 240 U.S. 179, 181 [36 S.Ct. 288, 60 L.Ed. 590].)

As to the acts of the defendant and its predecessors in using "Sunsweet" as a trademark when its registration had been refused, the defendant claims it but abbreviated the trademark from "Nicholson's Sunsweet" to the word "Sunsweet." The contention is not new. A similar contention was made in *John Morrell & Co.* v. *Hauser Packing Co.*, 20 F.2d 713. That court said: "It further appears from the evidence that in June, 1897, plaintiff registered its trademark as 'Iowa's Pride,' and in October, 1916, as 'Dakota's Pride,' and in January, 1920, as 'Morrell's Pride'; never prior to 1922 as 'Pride' alone. Manifestly its present contention that 'Pride' alone has always been its actual trademark, and that the words used and registered in combination therewith are to be disregarded, is a conception to be attributed to recent necessity. . . .

"As said by the court below, within the scope of the complaint the question is not whether the word 'Pride' could, but whether it did in fact, become plaintiff's trade-mark prior to 1907. And we concur in answering the question in the negative. In the combination as actually used, and as registered, both words are given equal prominence, and to ignore one would be quite as arbitrary as to ignore the other. Both in the Patent Office and on the market, plaintiff declared its trade-mark to be, not 'Pride,' but 'Morrell's Pride,' or some other combination. Under such circumstances, the trademark must be deemed to consist of the combination. *Armour & Co.* v. *Louisville P. Co.* (*D.C.*), 275 F. 92; Id. (C.C.A.) 283 F. 42."

The defendant contends the word "Sunsweet" is merely descriptive of the process of curing and is not susceptible of being used as a trademark. (*Patton Paint Co.* v. *Sunset Paint Co.*, 290 F. 323 [53 App.D.C. 348].) The facts of that case show it is not helpful. Each of the cases depends on its own facts. (*Harlan-Wallins Coal Corp.* v. *Transcontinental Oil Co.*, 64 F.2d 122, 123.) As to all facts the trial court has passed on them and has made its findings. Those findings are conclusive in this court. Bearing in mind that in the instant case we are considering findings of the trial

court, that such findings sustain the claim of the plaintiff to the word "Sunsweet" accompanied by the design of a sunburst, it is settled law that a court of review will not "draw fine distinctions to upset the discretion of a trial court in awarding a preliminary injunction where the equities are so clearly in favor of the owner of a trade-mark over which he has exercised exclusive control and use for a period of ten years or more." (*Sun-Maid Raisin Growers* v. *Mosesian,* 84 Cal.App. 485, 493 [258 P. 630].)

The defendant stresses the classification made in the U. S. Patent Office. Such classification is of importance, but it is not controlling. (*Harlan-Wallins Coal Corp.* v. *Transcontinental Oil Co., supra.*) In that case the court said it "has never deemed the Patent Office classification of articles to be of controlling importance in the ascertainment of whether two articles are of the same descriptive properties. In fact, we have many times held to the contrary." In *Aluminum Cooking Utensil Co.* v. *Sargoy Bros & Co.*, 276 F. 447, at page 448, the court said: "Validity of trade marks cannot depend upon classification or indexing by the Patent Office alone."

The defendant contends the judgment was too broad in ordering it to account for all profits. It contends such order should have been limited to sales made in this state. It presents no authority showing that the judgment should have been so limited. We know of none. There was evidence that defendant did business in California, but the record does not show how much. The trial court did not take an account. As to unfair competition the second cause pleaded in plaintiff's complaint was a common-law count charging the defendant had committed certain frauds. Plaintiff had the right to go into the trial court and ask for relief against fraud committed in this state. If perchance some acts of fraud were committed in other states such fact did not limit the jurisdiction of the trial court to proceed and hear all allegations of the complaint filed by the plaintiff. When equity takes jurisdiction it does so for all purposes. In 4 Pom.Eq. Jur. (5th ed.), § 1318, the author said: "Where the subject-matter is situated within another state or country, but the parties are within the jurisdiction of the court, any suit may be maintained and remedy granted which *directly* affect and operate upon the person of the defendant, and not upon the subject matter, although the subject matter is referred

to in the decree, and the defendant is ordered to do or to refrain from certain acts toward it, and it is thus ultimately but *indirectly* affected by the relief granted. As examples of this rule, suits . . . for relief on the ground of fraud, actual or constructive, . . . and the like, may be brought in any state where jurisdiction of defendant's person is obtained, although the land or other subject matter is situated in another state, or even in a foreign country.'' In actions to enjoin infringement of trademarks the above rule has been directly followed. (*Vacuum Oil Co.* v. *Eagle Oil Co.,* 154 F. 867, 875; *Hecker H-O Co., Inc.* v. *Holland Food Corp.,* 31 F.2d 794; *Morris* v. *Altstedter,* 93 Misc. 329 [156 N.Y.S. 1103].) Furthermore, the defendant's contention is premature. The trial court has ordered an accounting but the record before us shows no evidence of any specific sales. If and when an accounting is had the question presented by the defendant may arise, however it has not arisen as yet. The defendant appeared, answered and fully participated in the trial. By its answer it denied nearly every allegation pleaded in plaintiff's complaint, and prayed for general relief. True it is that by its pleading it attempted to limit its appearance as special. It cites no authority supporting such procedure. *Roberts* v. *Superior Court,* 30 Cal.App. 714 [159 P. 465], states the rule fully. Under the facts the defendant made a general appearance and the contention which it now makes may not be sustained.

The judgment appealed from is affirmed.

Nourse, P. J., and Goodell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 12, 1945.